100 F.3d 1525
 J. PAUL PRESEAULT and PATRICIA PRESEAULT, Individually and as Partners of 985 ASSOCIATES, LTD., a Vermont Limited Partnership, and 985 ASSOCIATES, LTD., Plaintiffs-Appellants,
v.
THE UNITED STATES, Defendant-Appellee,
and
THE STATE OF VERMONT, Defendant/Cross-Appellant.
 Nos. 93-5067, 93-5068
 United States Court of Appeals,
THE FEDERAL CIRCUIT
 DECIDED: November 5, 1996
 
 Appealed from: United States Court of Federal Claims, Judge Miller Patrick W. Hanifin, New England Legal Foundation, Boston, MA, argued, for plaintiff-appellants. With him on the brief were Emily R. Livingston, Brookline, MA, and Stephen S. Ostrach, Boston, MA.
 Jeffrey P. Kehne, Attorney, Environment and Natural Resources Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Peter r. Steenland, Jr., Acting Assistant Attorney General, and James E. Brookshire, Springfield, VA, Susan V. Cook and Robert L. Klarquist, Washington, DC, Attorneys. Of counsel on the brief was Louis Mackall, Office of General Counsel, Interstate Commerce Commission, Washington, DC.
 John K. Dunleavy, Assistant Attorney General, Vermont Agency of Transportation, Montpelier, VT, argued for defendant/cross-appellant. With him on the brief was Jeffery L. Amestory, Attorney General.
 William Perry Pendley, Mountain States Legal Foundation, Denver, CO, for amici curiae Maurice L. and Delores J. Glosemeyer.
 Thomas C. Jackson, Beveridge & Diamond, P.C., Washington, DC, for amici curiae Rails-to-Trails Conservancy and The National Trust for Historic Preservation in the Unioted States. With him on the brief were Henry L. Diamond and David G. Isaacs, Washington, DC, and J. Andrew Stephenson, New York City. Of counsel on the brief were Andrea C. Ferster, General Counsel, Rail-to-Trails Conservancy, Washington, DC, and David A. Doheny, General Counsel, and Elizabeth S. Merritt, Associate General Counsel, National Trust for Historic Preservation, Washington, DC.
 John D. Echeverria, National Audubon Society, Washington, DC, for amicus curiae National Audubon Society.
 Before Rich, Newman, Mayer, Michel, Plager, Lourie, Clevenger, Rader, and Schall, Circuit Judges.*
 Opinion filed by Circuit Judge PLAGER, in which Circuit Judges RICH, Newman, and Mayer join. Concurring opinion filed by Circuit Judge RADER, in which Circuit Judge LOURIE joins. Dissenting opinion filed by Circuit Judge CLEVENGER, in which Circuit Judges MICHEL and SCHALL join.
 PLAGER, Circuit Judge.
 
 
 1
 In this Takings case, the United States denies liability under the Fifth Amendment of the Constitution[1] for actions it took pursuant to the Federal legislation known as the Rails-to-Trails Act.[2] The original parties to the case were the property owners, J. Paul and Patricia Preseault,[3] plaintiffs, and the United States (the "Government"), defendant. The State of Vermont (the "State"), claiming an interest in the properties involved, intervened and, under the joinder rules of the Court of Federal Claims, entered its appearance as a co-defendant. The Court of Federal Claims, on summary judgment after hearings and argument, concluded that the law was on the Government's side, and rendered judgment against the complaining property owners. Preseault v. United States, 27 Fed. Cl. 69 (1992). The property owners appeal.
 
 
 2
 The appeal initially was heard by a three-judge panel which agreed with the trial court judgment in the Government's favor and affirmed. Preseault v. United States, 66 F.3d 1167 (Fed. Cir. 1995). Subsequently the full court concluded that the case raised important issues of Constitutional dimension, and that it was not certain that the property owners were wrong in their claims. Accordingly, the panel opinion was vacated, the case was taken in banc, and additional briefing and argument was ordered. Preseault v. United States, 66 F.3d 1190 (Fed. Cir. 1995).
 
 
 3
 The matter having now been heard before the in banc court, and thorough consideration having been given to the issues and to the arguments of the parties and the several amici[4], we conclude that, for the reasons we shall explain, the trial court erred in giving judgment for the Government; that judgment is reversed. The case is remanded to the trial court for further proceedings to determine the just compensation to which the property owners are entitled.
 
 A. INTRODUCTION AND SUMMARY
 
 4
 In brief, the issue in this case is whether the conversion, under the authority of the Rails-to-Trails Act and by order of the Interstate Commerce Commission, of a long unused railroad right-of-way to a public recreational hiking and biking trail constituted a taking of the property of the owners of the underlying fee simple estate. At this point we shall refer to the railroad's interest in the property by the term "right-of-way." That term is sufficient to indicate that the railroad had obtained a property interest allowing it to operate its equipment over the land involved. Later in the opinion it will become important to more precisely delineate the nature of the railroad's property interests, after which the use of the term "right-of-way" will refer only to those defined interests.
 
 
 5
 The facts of the case are reported in full in the several opinions already rendered in connection with this matter: the decision of the United States Court of Appeals for the Second Circuit, holding the Rails-to-Trails Act constitutional and the Preseaults without remedy, Preseault v. ICC, 853 F.2d 145 (2d Cir. 1988) (Preseault I)[5] ; the decision of the United States Supreme Court, on certiorari from the Second Circuit, affirming the constitutionality of the Rails-to-Trails Act on its face, but concluding that the Preseaults may have a remedy in the Court of Federal Claims under the Tucker Act for a Fifth Amendment "taking," Preseault v. ICC, 494 U.S. 1 (1990) (Preseault II); the initial decision of the Court of Federal Claims, Preseault v. United States, 24 Cl. Ct. 818 (1992) (Preseault 1), in which the trial judge, after hearing and argument, granted partial summary judgment for the Preseaults, and denied the Government's cross-motions for summary judgment; and the final judgment of the Court of Federal Claims, reported at 27 Fed. Cl. 69 (1992) (Preseault 2), concluding that the law was against the Preseault's claim for compensation under the Fifth Amendment, granting the Government's second cross-motion for summary judgment, and ordering judgment dismissing the complaint.[6]
 
 
 6
 There are also two decisions in related matters by the Supreme Court of Vermont. The first, in 1985, holds that affected property owners (in that case the Preseaults and others) cannot maintain a suit in state court for a declaration of rights concerning the matter at issue before us because the matter is exclusively within the province of the Federal Government pursuant to the provisions of the Interstate Commerce Commission Act, and that the state court is therefore without subject matter jurisdiction. Trustees of the Diocese of Vermont v. State, 145 Vt. 510, 496 A.2d 151 (1985). The second state court decision, some ten years later, affirms an injunction against the Preseaults prohibiting them from using that part of their property subject to the original right-of-way for any purpose other than as members of the general public. State v. Preseault, 652 A.2d 1001 (Vt. 1994). In light of this record, we refer the reader to the earlier opinions for the full details of the events leading up to this appeal. For purposes of the decision here we summarize and condense that history, and recite only the salient facts relevant to the decision.
 
 
 7
 On appeal we affirm a summary judgment if the record before us discloses that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although we give due consideration to the views of the trial court, we decide anew questions about the applicable law, without deference to those views.
 
 
 8
 In summary, we conclude that the trial court was correct in finding that the 1899 transfers to the railroad created easements for use for railroad purposes; the fee estates remained with the original property owners. (Part C.1.) We accept the Government's position that ultimately this is a matter to be decided under controlling federal law and Constitution, but we reject the Government's central thesis that general federal legislation providing for the governance of interstate railroads, enacted over the years of the Twentieth Century, somehow redefined state-created property rights and destroyed them without entitlement to compensation. (Part C.2.) The trial court erred in accepting that thesis.
 
 
 9
 As far as the Government's defenses based on the state's property law are concerned, we conclude that even if these easements were still in existence at the time the trail was created, there was no legal justification for the intrusion upon the Preseault's property. We find no support in Vermont law for the proposition, propounded by the defendants and accepted by the dissent, that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails (Part D). But we find no clear error in the trial court's determination that in fact these easements had been abandoned years before the creation of the trail (Part E), and that determination is affirmed.
 
 
 10
 Finally, we conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. Whether the State's role in the matter should have resulted in liability for the State, or whether the State could absolve itself by pointing to the Federal Government, as the State Court held, is immaterial. The Federal Government authorized and controlled the behavior of the State in this matter, and the consequences properly fall there. (Part E.)
 
 B. Factual Background
 
 11
 The Preseaults own a fee simple interest in a tract of land near the shore of Lake Champlain in Burlington, Vermont, on which they have a home. This tract of land is made up of several previously separate properties, the identities of which date back to before the turn of the century. The dispute centers on three parcels within this tract, areas over which the original railroad right-of-way ran. The areas are designated by the trial court as Parcels A, B, and C. Two of those parcels, A and B, derive from the old Barker Estate property. The third parcel, C, is part of what was the larger Manwell property.
 
 
 12
 The Rutland-Canadian Railroad Company, a corporation organized under the laws of Vermont, acquired in 1899 the rights-of-way at issue on Parcels A, B, and C, over which it laid its rails and operated its railroad. Over time the ownership interests of the Rutland-Canadian passed into the hands of several successor railroads with different names; except as it may be necessary to differentiate among them, they will be referred to collectively as the Railroad.
 
 
 13
 Meanwhile, ownership of the properties over which the rights-of-way ran passed through the hands of successors in interest, eventually arriving in the hands of the Preseaults. A map of the Preseault tract, showing the various parcels and the areas subject to the railroad's rights-of-way, appears in 27 Fed. Cl. at 72, and is reproduced here for the benefit of the reader:[7]
 
 
 14
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 C. The Property Interests
 
 15
 In Preseault II, Justice Brennan writing for the Supreme Court noted the importance of determining the nature of the interests created by these turn-of-thecentury transfers:
 
 
 16
 The alternative chosen by Congress [the Rails-to-Trails program] is less costly than a program of direct federal trail acquisition because, under any view of takings law, only some rail-to-trail conversions will amount to takings. Some rights-of-way are held in fee simple. Others are held as easements that do not even as a matter of state law revert upon interim use as nature trails.
 
 
 17
 Preseault II, 494 U.S. at 16 (citation omitted).
 
 
 18
 Justice O'Connor, in a concurring opinion for herself and Justices Scalia and Kennedy, developed the point further:
 
 
 19
 [T]he parties sharply dispute what interest, according to Vermont law, the State of Vermont acquired from the Rutland Railway Corporation and, correspondingly, whether petitioners possess the property interest that they claim has been taken. . . . Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim. We do not attempt to resolve that issue.
 
 
 20
 Id. at 20 (citation omitted).
 
 
 21
 Clearly, if the Railroad obtained fee simple title to the land over which it was to operate, and that title inures, as it would, to its successors, the Preseaults today would have no right or interest in those parcels and could have no claim related to those parcels for a taking. If, on the other hand, the Railroad acquired only easements for use, easements imposed on the property owners' underlying fee simple estates, and if those easements were limited to uses that did not include public recreational hiking and biking trails ("nature trails" as Justice Brennan referred to them), or if the easements prior to their conversion to trails had been extinguished by operation of law leaving the property owner with unfettered fee simples, the argument of the Preseaults becomes viable.
 
 
 22
 The determinative issues in the case, then, are three: (1) who owned the strips of land involved, specifically did the Railroad by the 1899 transfers acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.
 
 
 23
 The Government enriches the case with an argument that would have profound impact on future takings jurisprudence: that the general federal legislation providing for the Government's control over interstate railroad operations as enacted and amended over the years had the effect of redefining the private property rights of these owners, leaving them without a compensable interest in the land.
 
 
 24
 Before addressing these several issues, a preliminary matter. There is an alternative way, frequently used today including by the parties here, to describe property transactions involving easements. Instead of calling the property owner's retained interest a fee simple burdened by the easement, this alternative labels the property owner's retained interest following the creation of an easement as a "reversion" in fee. Upon the termination, however achieved, of the easement, the "reversion" is said to become fully possessory; it is sometimes loosely said that the estate "reverts" to the owner.
 
 
 25
 Under traditional common law estates terminology, a "reversion" is a future interest remaining in the transferor following the conveyance of certain lesser estates to a transferee, typically when the transferee takes a possessory estate of freehold, for example a life estate. An easement is not such a possessory estate of freehold.[8] Traditional characterization describes an easement as a "use" interest, sometimes an "incorporeal hereditament," but not a "possessory" interest in the land.[9] Therefore labeling the retained interest a "reversion" is not consistent with the traditional classification scheme, which views the retained interest as a present estate in fee simple, subject to the burden of the easement.
 
 
 26
 Be that as it may, whether the property owner's retained interest following the conveyance of an easement is denominated a fee simple estate or a reversion, it is uniformly treated at common law as a vested estate in fee. Under either characterization the result upon termination of the easement is the same. For consistency we use the traditional terminology which recognizes that the transferor remains seised of the freehold estate, and thus labels the owner's estate as a fee simple, burdened, during the life of the easement, by the easement-holder's rights.
 
 1. The Interests Created
 
 27
 The question of what estates in property were created by these turn-of-the-century transfers to the Railroad requires a close examination of the conveying instruments, read in light of the common law and statutes of Vermont then in effect. Ideally that question would be decided by the State of Vermont's courts, utilizing their knowledge of and experience with their state's property law. However, when the question of the rights of the property owners vis-a-vis the successors of the Railroad was raised in the Vermont courts in the suit brought in 1981, cited above, the Vermont Supreme Court took the position that the state courts were without subject matter jurisdiction due to the pervasive role of the Federal Government in railroad matters. See Trustees of the Diocese of Vermont v. State, 145 Vt. 510, 496 A.2d 151 (1985). The Vermont courts thus declined to address the question. Later, when this question of state law came before this court in banc, the possibility of referring the question back to the state courts was considered. However, at the argument in the case before us we were advised by the State's Assistant Attorney General that Vermont has no mechanism for having such a question referred by a federal court to the state courts for decision. We have no choice, then, but to determine this question of state law ourselves.
 
 
 28
 In this undertaking we have the benefit of careful analysis by the trial judge. With regard to the two parcels, A and B, derived from the Barker Estate, the trial judge examined, as have we, the document referred to as a "Commissioner's Award," dated September 2, 1899, as well as the relevant cases and statutes of Vermont. The Commissioner's Award, which is the only document that memorializes the event, is unlike a deed in that it does not contain the usual premises (the clause describing the parties to and purposes of the transaction) or habendum clause (defining the extent of the ownership interest conveyed). Usually in a deed the habendum clause would define the exact interest to be conveyed, whether a fee simple or a lesser interest, although the premises clause sometimes serves as well.
 
 
 29
 Here, the Commissioner's Award simply confirms that "the Rutland-Canadian Railroad Company . . . for the purposes of its railroad has located, entered upon and occupied lands owned by [the Barkers] . . . described as follows [and here follows a metes and bounds description of the strip of land]." The document then states that the owners of the land and the Railroad have not agreed as to the damages to be paid to the owners, that upon application by the Railroad three disinterested commissioners were appointed by the Supreme Court of Vermont, and that "according to the provisions of the Act incorporating said Company and the Statutes of the State of Vermont" the commissioners "appraise and determine the damage to the said owners of said land occasioned by such location, entry and occupation by the said Company" to be a stated sum.
 
 
 30
 The references to the purposes of the Railroad, and to the provisions of the Act incorporating it, are to 1898 Vermont Acts No. 160, entitled "An Act to Incorporate the Rutland-Canadian Railroad Company," approved November 4, 1898. That Act provided that certain named individuals
 
 
 31
 constituted and created a body politic and corporate by the name of the "Rutland-Canadian Railroad Company," for the purpose and with the right of constructing, maintaining and operating a railroad for public use in the conveyance of persons and property by the power of steam or otherwise . . . . Said Corporation shall have and enjoy the right of eminent domain . . . [and] may . . . take . . . such real and personal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad . . . as the purposes of the corporation may require . . . .
 
 
 32
 1898 Vt. Acts No. 160, Section(s) 1. The Act goes on to state that the corporation shall have all privileges and rights given by the general law to railroad companies for acquiring title and possession to property covered by its location.
 
 
 33
 It is clear from the relevant documents and statutes that the actions of the Railroad in this case fall under well-established Vermont laws and procedures for acquisition of rights-of-way by companies incorporated for railroad purposes. In her opinion, the trial judge concluded that, in the context of the Vermont procedure for commissioners' awards for railroad rights-of-way, and in light of the Vermont case law, cited and discussed in the trial court's opinion, "[t]he portion of the right-of-way consisting of the parcel of land condemned from the Barker Estate and taken by commissioner's award is indisputably an easement under the law of the State of Vermont." 24 Cl. Ct. at 827.
 
 
 34
 As a result of our independent examination of the question we conclude that there is little real dispute about this. That was the rule in the early Vermont cases, and continues to be the rule today. See, e.g., Dessureau v. Maurice Memorials, Inc., 132 Vt. 350, 351, 318 A.2d 652 (1974) ("The taking, pursuant to statutory authority, gave the railroad only an easement, not a fee, and upon abandonment, the property reverts to the former owner.") (citing Troy & Boston R.R. v. Potter, 42 Vt. 265, 274 (1869)). In Troy & Boston Railroad v. Potter, the suit was an action of trespass on the freehold, testing the question of whether the original property owner who sold the right-of-way to the railroad retained the right to harvest the herbage and other products of the soil growing on the right-of-way. The right-of-way had been surveyed and located, and there was some dispute over whether a conveying document had been properly executed and recorded. The court held that, regardless of the recording question, the survey and location of the road is what constitutes the taking of the land over which it was laid. Troy & Boston R.R. v. Potter, 42 Vt. at 272. Consistent with its earlier decision in Hill v. Western Vermont. Railroad, 32 Vt. 68 (1859), the court deemed the railroad to have acquired only an easement and not a fee, but nevertheless concluded that the railroad had the sole and exclusive possession of the land while in the exercise of that easement, "so to keep it as to exclude all probability of any accident resulting from any outside interference with such possession." Troy & Boston R.R. v. Potter, 42 Vt. at 276. With few exceptions the Vermont cases are consistent in holding that, practically without regard to the documentation and manner of acquisition, when a railroad for its purposes acquires an estate in land for laying track and operating railroad equipment thereon, the estate acquired is no more than that needed for the purpose, and that typically means an easement, not a fee simple estate.[10] The trial court fully and correctly analyzed the matter; it hardly needs further elaboration. We find no error in the trial court's analysis and conclusion, and it is affirmed.
 
 
 35
 Determining the provenance of the third parcel, C, derived from the Manwell tract, tests the above stated proposition even further. The operative instrument is a warranty deed, dated August 2, 1899, from Frederick and Mary Manwell to the Railroad. The deed contains the usual habendum clause found in a warranty deed, and purports to convey the described strip of land to the grantee railroad "[t]o have and to hold the above granted and bargained premises . . . unto it the said grantee, its successors and assigns forever, to its and their own proper use, benefit and behoof forever." The deed further warrants that the grantors have "a good, indefeasible estate, in fee simple, and have good right to bargain and sell the same in manner and form as above written . . . ." In short, the deed appears to be the standard form used to convey a fee simple title from a grantor to a grantee.
 
 
 36
 But did it? At the outset it should be noted that the resolution of this issue will not moot the question of the Government's potential liability for its action in creating the recreational trail, since, as held above, the A and B parcels unquestionably involved conveyances of easements and not fee simple estates, and thus the question of a taking of the Preseaults' property remains to be decided. The issue of ownership of Parcel C does go to the question of damages, however. As noted earlier, if the Manwell transfer was a conveyance in fee simple, the Preseaults would have acquired no interest in that strip of land, and can claim no damages for its later use as a recreational trail.
 
 
 37
 At trial, the Preseaults argued that, although the Manwell deed purports to grant a fee simple, the deed was given following survey and location of the right-of-way and therefore it should be construed as conveying only an easement in accordance with Vermont railroad law. The Government responded that, while it was true that survey and location of the railroad's right-of-way had occurred, no "formal" eminent domain proceedings had taken place, and therefore the deed should be taken at its face as a conveyance in fee simple. Each side cited Vermont cases to support its position. The trial court, after reviewing and discussing at length the cases and other relevant materials, concluded that "[u]nder well-settled Vermont law, the property interests in the parcel . . . conveyed following survey and location by warranty deed, amounted to [an] easement[] . . . ." 24 Cl. Ct. at 830.
 
 
 38
 Our independent review of the state of Vermont law on this issue leads us to conclude, despite some uncertainties in the matter, that the trial court is correct. Part of the problem is that the Vermont cases that seem most on point are quite old. Assuming the Vermont courts would follow its precedents, a fair assumption, the probable outcome is that, despite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement. Two cases, from among others, will illustrate why.
 
 
 39
 In Hill v. Western Vermont Railroad, 32 Vt. 68, the railroad had a contract with one Josiah Burton to purchase some land for railroad purposes. The bond, or contract, entered into before the railroad had surveyed their right-of-way called for Burton to convey such lands "as shall be required" for the company's road. Plaintiff, a creditor of the railroad, attempted to levy on a part of the land potentially subject to the contract. The railroad defended against the levy by arguing that the tract at issue was not needed by the railroad for its purposes, and thus Burton could not have been made to sell it to the railroad. Since, it was argued, the claimed land was not subject to contract enforcement, it was not subject to the levying creditor.
 
 
 40
 The Vermont Supreme Court held for the railroad. The court observed that railroads acquire needed land either by order of a designated public body (through the exercise of eminent domain) or by consent of the landowner, although even in the latter case "the proceeding is, in some sense, compulsory." Id. at 75. Thus,
 
 
 41
 [i]n either mode of appropriating land for the purposes of the company, there is this implied limitation upon the power, that the company will take only so much land or estate therein as is necessary for their public purposes. It does not seem to us to make much difference in regard to either the quantity or the estate whether the price is fixed by the commissioners or by the parties.
 
 
 42
 Id. at 76. The court held that the estate which Burton was to convey would be "a mere easement for a particular use," and under the governing statute would not be subject to a levy. Id. at 77.
 
 
 43
 Ten years later the Vermont Supreme Court decided Troy & Boston Railroad v. Potter, discussed above. As noted, the right-of-way in that case had been surveyed and located, but there was some dispute over whether a conveying document had been properly executed and recorded. The court held that, regardless of the recording question, the survey and location of the road is what constitutes the taking of the land over which it was laid. Id., 42 Vt. at 272. Consistent with Hill, the court deemed the railroad to have acquired only an easement and not a fee.
 
 
 44
 Thus it is that a railroad that proceeds to acquire a right-of-way for its road acquires only that estate, typically an easement, necessary for its limited purposes, and that the act of survey and location is the operative determinant, and not the particular form of transfer, if any. Here, the evidence is that the Railroad had obtained a survey and location of its right-of-way, after which the Manwell deed was executed confirming and memorializing the Railroad's action. On balance it would seem that, consistent with the view expressed in Hill, the proceeding retained its eminent domain flavor, and the railroad acquired only that which it needed, an easement for its roadway. Nothing the Government points to or that we can find in the later cases would seem to undermine that view of the case; the trial court's conclusion that the estate conveyed was an easement is affirmed.
 
 
 45
 We thus conclude that fee simple title to all three parcels in dispute remained with their original owners, subject only to the burden of the easements in favor of the Railroad. Those titles passed through various hands, coming to rest eventually in the hands of the Preseaults, where they lay in 1986 when the public recreational trail was created by the Government's action.
 
 2. The Impact of Federal Legislation
 
 46
 The United States argues that the property interests in Parcels A, B, and C at the time the Preseaults acquired them are defined not by the original conveyances, as understood pursuant to state law, but by the evolving enactment and implementation of federal railroad law between 1899 and the date (1980 for parcels A and B; 1966 for parcel C) the Preseaults acquired the parcels. As a consequence, says the Government, when the Preseaults bought the land whatever rights might have existed in prior owners regarding possession following abandonment of the easements no longer existed, those rights having been modified or abolished by the Federal Government's plenary authority over rail operations. There are several flaws, both of logic and of law, in this argument.
 
 
 47
 There can be no denying that the Federal Government, beginning as early as 1920, has occupied the field of regulation of interstate railroad operations, preempting any pattern of conflicting state regulation. See, e.g., Transportation Act of 1920, ch. 91, 41 Stat. 456 (1920); Rail Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31 (1976) ("4-R Act"); 49 U.S.C.. Section(s) 101 et seq. And there can be no question that if the Federal Government wishes to create a national network of public recreational biking and hiking trails, it is within its power to do so. See Preseault II, 494 U.S. 1. And that power includes the power to preempt state-created property rights, including the rights to possession of property when railroad easements terminate. Id. However, as Justice O'Connor succinctly pointed out in her concurring opinion, having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another. Id. at 22.
 
 
 48
 The 1899 conveyances of Parcels A, B, and C established state-created rights in the owners of the underlying land to have unfettered possession upon the termination of the railroad's easements. If those rights were subsequently and sub rosa destroyed by Federal legislation, prior to the acquisition of the properties by the Preseaults, when did it happen? Could the Transportation Act of 1920 by itself have done it? Not very well. The passage of that Act, which in essence gave the ICC regulatory power over the conduct of railroads, including the establishment and cessation of service to any given community, in and of itself terminated no easements. The Act did not purport to address the rights of private property owners; indeed, it affected railroad operations themselves only with regard to future conduct and then only upon the issuance of individual orders of the ICC. And indeed, no change in the service use of Parcels A, B, and C occurred until 1970, some fifty years after enactment of the original Act.
 
 
 49
 If in 1920 the then-owners of these parcels had brought suit against the United States for a taking as a result of the enactment of the Transportation Act of 1920, it is difficult to imagine that any court would have granted them an award. The owner would have had to argue that the taking was a regulatory taking, since no actual physical occupation by the Government happened until fifty years later. But that was not a likely argument in 1920. The concept of regulatory takings as we know them today was not yet born; Justice Holmes did not utter his famous statement about regulation that "goes too far" until two years later.[11]
 
 
 50
 Furthermore, enactment of broad general legislation authorizing a federal agency to engage in future regulatory activity is not the type of government action that alone supports a taking claim. See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264 (1981) (provisions of Surface Mining Control and Reclamation Act prescribing performance standards and authorizing variances for land development, including provisions prohibiting mining in certain locations, did not, on their face, violate the takings clause). If Congress intended the 1920 Act to have such an effect, contrary to all established assumptions about general legislation, and with the result of directly obligating the Government to a potentially enormous liability of unknown dimensions for takings throughout the United States, there surely would have been some indication of that intent in the legislative history, if not in the legislation itself. The Government points to none, because none exists.
 
 
 51
 The same problem prevails with regard to the enactment in 1976 of the 4-R Act, which contained authorization for the ICC to order a railroad, proposing to dispose of an unneeded right-of-way, to first offer it for sale for "public purposes." 49 U.S.C. Section(s) 10906 (1994). And even if the 1983 Rails-To-Trails Act was part of the evolving history pre-Preseault (which it was not since their ownership of all three parcels was vested by 1980), that Act also requires an administrative decision to apply the law to any given unused easement. Until the ICC makes the administrative decision to convert an unused right-of-way to a trail, rather than simply permit abandonment, and finds an appropriate public agency to operate the trail, a landowner's suit for a taking would run afoul of established requirements for exhaustion of administrative remedies. See, e.g., Hodel, 452 U.S. 264; Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985).
 
 
 52
 Thus any property owner who was prescient enough to allege a regulatory taking following the enactment of the Transportation Act of 1920, in addition to having some doctrinal explaining to do, presumably would have been met by an equally prescient Government with the defenses of absence of ripeness and failure to exhaust administrative remedies.
 
 
 53
 The Government attempts to evade this legal morass by not identifying any specific event that destroyed these property rights created back in 1899, but by instead invoking the broad concept that "background principles" define property rights, suggesting that there is nothing to preclude the use of federal law as well as state law in selecting the relevant "background principles." In support of this broad principle the Government relies heavily on phrases extracted from the Supreme Court's recent decision in Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992).
 
 
 54
 But Lucas provides no such support. The background principles referred to by the Court in Lucas were state-defined nuisance rules. Id. at 1029-32. In Lucas the Court took the position that if the State of South Carolina wished to control what it considered undesirable conduct by property owners (in that case building a house on beachfront property), a regulatory agency's order preventing the conduct was non-compensable under the Fifth Amendment if the imposition did little more than echo similar constraints available under the State's traditional nuisance law. In other words, the State could impose non-compensable restraints on property owners either through court-ordered injunctions or administrative agency orders, so long as either were within the scope of established state law principles of common law nuisance, principles which inhere in every property owner's title. Id.
 
 
 55
 Nothing in Lucas suggests that the background principles of a state's property law include the sweep of a century of federal regulatory legislation, and indeed much of what the Supreme Court said then, as well as in Preseault II, about property rights indicates to the contrary. Nor is there any suggestion in this case that the Preseaults' use of their property could be considered in any way to be a public nuisance under traditional nuisance concepts, justifying the intervention of state authorities.
 
 
 56
 The Government cites two recent cases by this court, M & J Coal Co. v. United States, 47 F.3d 1148 (Fed. Cir.), cert. denied, 116 S. Ct. 53 (1995), and California Housing Securities, Inc. v. United States, 959 F.2d 955 (Fed. Cir. 1992), as evidence that federal regulatory law generally modifies state property rights, and renders conflicting state-created property rights unenforceable and noncompensable. In M & J Coal we held that the Government, in enforcing the provisions of the Surface Mining Control and Reclamation Act of 1977, could require a coal mine operator to mine in a manner that prevented surface subsidence, and thus prevent harm to the interests of third parties. We rejected the companies' contention that enforcement of these safety standards took their property in violation of the Fifth Amendment. In California Housing, we upheld the right of federal bank regulators, in the course of enforcing the federal regulatory framework governing the banking industry, to seize the books and papers and occupy the premises of a bank that was subject to an enforcement action.
 
 
 57
 In both cases what was at issue was the reasonableness of the Government's actions in enforcing the law. Since no one has a property right to violate otherwise valid laws controlling social conduct, the claims that enforcement of the law, found to have been conducted reasonably under the circumstances, constituted a taking under the Fifth Amendment were unavailing. In the Preseaults' case, the occupation of their property by the Government was not in pursuance of an enforcement action to correct prohibited conduct on their part, unless it can be said that their desire to enjoy their private property without sharing it with the public falls under that rubric.
 
 
 58
 This argument, that the Preseaults' title somehow incorporates the federal transportation regulatory statutes enacted since the 19th Century, was made by the Government to the trial court, and again in its opening brief before the original panel, based on a different theory than the Lucas "background principles" concept presented to the in banc court. It is unclear whether the Government intended to abandon the earlier theory, but since it was the one accepted by the trial court in holding for the Government, it warrants examination.[12]
 
 
 59
 The argument goes as follows. These regulatory statutes governing railroad operations, at least the original statute enacted in 1920 authorizing ICC jurisdiction, were on the books when the Preseaults began buying the parcels at issue. As a consequence, the Preseaults should have anticipated that at some time in the future the Government might exercise its general regulatory powers in a way that could frustrate the Preseaults' interest in obtaining the land free of the easement upon its abandonment by the railroad. Thus the Preseaults could have no "reasonable expectations" that they would ever get the property free of the encumbering easement even if the railroad ceased to use it. Absent such an expectation, the Preseaults cannot complain that anything was taken from them; the title acquired by the Preseaults in effect has been modified by the history of federal regulatory enactments.
 
 
 60
 Support for this novel notion is found in two sentences lifted out of context from the Supreme Court's decision in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), which ironically is the decision that definitively established the rights of a property owner to compensation whenever there is a physical taking, even a relatively minor one. In Loretto, Justice Marshall, writing for the Court, said: "We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation . . . ." Loretto, 458 U.S. at 441. The Government reverses the order of the sentences, as if it read, "If the property owner has an expectation of compensation, then a permanent physical occupation of property is a taking." In effect, the Government argues that Loretto stands for the proposition that an owner's property rights are defined by what the owner might (should?) have believed the law to be at the time she acquired her property, and that that belief makes it so.
 
 
 61
 But what Justice Marshall clearly said was that a physical occupation of one's property by the Government, that is, a taking of a recognized property interest, invokes a general expectation of compensation. The Government's reading reverses the sentences, standing the law on its head. They read it to say that an owner's subjective expectations of keeping or losing her property under various possible scenarios define for that owner the extent of her title. Just the reverse is true. It is the law-created right to own private property, recognized and enforced by the Constitution, legislation, and common law, that gives the owner an historically rooted expectation of compensation. The expectations of the individual, however wellor ill-founded, do not define for the law what are that individual's compensable property rights.
 
 
 62
 This issue of title and ownership expectations must be distinguished from the question that arises when the Government restrains an owner's use of property, through zoning or other land use controls, without disturbing the owner's possession. Placing restraints on an owner's use of her property invokes the regulatory takings issue, rather than the question of the Government's physical occupation of private property, and both factually and legally raises significantly different issues. In the regulatory taking cases the owner's reasonable investment-backed expectations have been held to be relevant to the question of whether a regulatory imposition goes too far in constraining the owner's lawful uses of the property. E.g., Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). As the Supreme Court makes clear, these two quite different situations call for quite different analyses. The Government's attempt to read the concept of "reasonable expectations" as used in regulatory takings law into the analysis of a physical occupation case would undermine, if not eviscerate, long-recognized understandings regarding protection of property rights; it is rejected categorically.[13]
 
 
 63
 The trial court erred in accepting the Government's effort to inject into the analysis of this physical taking case the question of the owner's "reasonable expectations." Under the governing law of the State, the Preseaults, successors in title to those who owned the property when the easements were created, owned the same title and interest as they, and are entitled to the same protections the law grants.
 
 D. The Scope of the Railroad's Easement
 
 64
 We turn then to the question of whether the easements granted to the Railroad, to which the Preseaults' title was subject, are sufficiently broad in their scope so that the use of the easements for a public recreational trail is not a violation of the Preseaults' rights as owners of the underlying fee estate. Both the Government and the State argue that under the doctrine of "shifting public use" the scope of the original easements, admittedly limited to railroad purposes, is properly construed today to include other public purposes as well, and that these other public purposes include a public recreational hiking and biking trail. Under that theory of the case, the establishment in 1986 of such a trail would be within the scope of the easements presumably now in the State's hands, and therefore the Preseaults would have no complaint. On the other hand, if the Government's use of the land for a recreational trail is not within the scope of the easements, then that use would constitute an unauthorized invasion of the land to which the Preseaults hold title. The argument on this issue assumes that the easements were still in existence in 1986, and for purposes of this part of the discussion we assume they were.
 
 
 65
 As an initial matter, we have found no Vermont case, either in this century or the last, and the parties point to none, in which the Vermont courts establish or apply something called the "shifting public use" doctrine. The statement in the dissent that "Vermont common law includes the `shifting public use' doctrine as part of its law concerning the abandonment of easements" appears to be without support in any opinions of the Vermont courts. Thus the legitimacy of that phrase in the context of Vermont law, as well as its meaning, remain unclear.[14]
 
 
 66
 What is the case is that early opinions of the Vermont Supreme Court gave railroads broad scope to "do any act upon the land conducive to those public uses for which their charter was granted." Connecticut & Passumpsic Rivers R.R. v. Holton, 32 Vt. 43, 47 (1859). In Brainard v. Missisquoi Railroad, 48 Vt. 107 (1875), the court held that a railroad company that purchased a plank road company and replaced a plank road with a railroad maintained the right to an easement granted to the plank road company. The court held that the land did not "revert" to the owner of the fee estate, and that he was entitled to damages only for his loss of access to a public highway.[15]
 
 
 67
 As discussed previously, the Rutland-Canadian Railroad Company was incorporated by Act of the Vermont legislature solely "for the purpose and with the right of constructing, maintaining and operating a railroad for public use in the conveyance of persons and property by the power of steam or otherwise." The Act of incorporation specified that the corporation "may receive, take, hold, purchase, use and convey such real and personal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad as aforesaid, and its structures and appurtenances, and as the purposes of the corporation may require . . . ." And, as explained earlier, the governing documents, in the case of Parcels A and B the Commissioners' Award, in the case of Parcel C, the Manwell deed, do not themselves contain defining language, but instead incorporate the purposes specified in the incorporation Act. The question thus is whether an easement acquired for such specifically described purposes may be read broadly enough to include a public recreational biking and hiking trail. That precise issue has yet to be presented to the Vermont court.[16]
 
 
 68
 In the absence of a Vermont case on point, we must seek the answer in traditional understandings of easement law, recognizing as we must that Vermont follows and applies common law property principles. The easements involved here are express easements, meaning that the scope of the easements are set out in express terms, either in the granting documents or as a matter of incorporation and legal construction of the terms of the relevant documents. "The extent of an easement created by a conveyance is fixed by the conveyance." 5 Restatement of Property 482 (American Law Institute 1944). In a leading treatise on the subject, the authors state the general rule to be "[w]hen precise language is employed to create an easement, such terminology governs the extent of usage." Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ( 8.02[1], at 8-3 (rev. ed. 1995).
 
 
 69
 The general rule does not preclude the scope of an easement being adjusted in the face of changing times to serve the original purpose, so long as the change is consistent with the terms of the original grant:
 
 
 70
 It is often said that the parties are to be presumed to have contemplated such a scope for the created easement as would reasonably serve the purposes of the grant. . . . This presumption often allows an expansion of use of the easement, but does not permit a change in use not reasonably foreseeable at the time of establishment of the easement.
 
 
 71
 Richard R. Powell, 3 Powell on Real Property Section(s) 34.12[2] (Patrick J. Rohan ed., 1996).
 
 
 72
 Applying this test, courts have held that an easement for water flow to a fulling-mill included the right to water flow to a later-established corn-mill which replaced the earlier mill, Luttrel's Case, 4 Rep. 86 (1601); and that an easement for a vehicular way, granted at a time when horse and wagon was a common means of transport, would permit use of motor vehicles instead when the latter became common, see Matteodo v. Capaldi, 48 R.I. 312, 138 A. 38 (1927); Diocese of Trenton v. Toman, 74 N.J. Eq. 702, 70 A. 606 (1908).
 
 
 73
 Bernards v. Link, 248 P.2d 341 (Or. 1952), is a good example of the application of the test. The question was whether an easement for a logging railroad, granted to defendant's predecessor, would permit the substitution of a logging road for trucks, when the logging industry had moved to the use of such vehicles. The owners of the servient estate did not claim that the new use had subjected their property to any additional servitude, but that the new use constituted an abandonment of the original easement. The court reviewed the history of transportation in the logging industry, noting that the use of logging trucks and of logging roads had been an evolutionary development in the Northwest's logging industry: "[i]mprovements in trucks and the inexorable demand for lower cost of operation have made the logging road the successor to the logging railroad in divers places." Id. at 346. The court stated that
 
 
 74
 [t]he evidence renders it clear that the paramount purpose of the parties was to enable the grantee to bring to Carlton, over the right of way described in the deed, the logs which were being produced near Tillamook Gate. . . . [W]e do not believe that the grantor intended to restrict the grantee to the specific type of equipment which was then in use.
 
 
 75
 Id. 248 P.2d at 351-52. The court concluded that the use of logging trucks, after logging railroads became obsolete, was within the proper scope of the easement.
 
 
 76
 When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not. Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different. In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation. In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles. It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.
 
 
 77
 Furthermore, there are differences in the degree and nature of the burden imposed on the servient estate. It is one thing to have occasional railroad trains crossing one's land. Noisy though they may be, they are limited in location, in number, and in frequency of occurrence. Particularly is this so on a relatively remote spur. When used for public recreational purposes, however, in a region that is environmentally attractive, the burden imposed by the use of the easement is at the whim of many individuals, and, as the record attests, has been impossible to contain in numbers or to keep strictly within the parameters of the easement. As the Bruce & Ely treatise noted, "[a]n easement created to serve a particular purpose ends when the underlying purpose no longer exists," Bruce & Ely, supra, ( 10.03[1], at 10-12, and "when an easement for railway purposes is found, it is generally considered to end when it is no longer used for the stated purposes," id. ( 1.06[2][d], at 1-48. In the language of the old English courts, to allow this change would permit "a substantial variance in the mode of or extent of user or enjoyment of the easement so as to throw a greater burden on the servient tenement." Bernards v. Link, 248 P.2d at 347.
 
 
 78
 Most state courts that have been faced with the question of whether conversion to a nature trail falls within the scope of an original railroad easement have held that it does not. Lawson v. State, 730 P.2d 1308 (Wash. 1986) (in banc), is an example of a case practically on all fours with the case before us. The Burlington Northern Railroad Company petitioned the ICC for permission to discontinue rail service over a certain right-of-way. King County requested the ICC to determine that the right-of-way was suitable as a public recreational trail, and to require that it be offered for sale for public purposes. The ICC did so under its Rails-To-Trails authority, and King County acquired the right-of-way from the Railroad.
 
 
 79
 The property owners who owned the underlying fee estates sued in Washington State court for a declaratory judgment that this was an unlawful taking without just compensation. The trial court held for the County. The Washington Supreme Court, in banc, reversed. The Court stated the common law rule to be that when a deed conveys a right-of-way for railroad purposes only, upon abandonment by the railroad of the right-of-way the land over which the right-of-way passes "reverts" to the reversionary interest holder (the owner of the fee estate) free of the easement.
 
 The court then stated:
 
 80
 In addition to outright abandonment of a right of way, there may be a change in use of the right of way which is inconsistent with the purpose for which the right of way was granted. Where the particular use of an easement for the purpose for which it was established ceases, the land is discharged of the burden of the easement and right to possession reverts to the original land owner or to that landowner's successor in interest.
 
 
 81
 Id. 730 P.2d at 1312. The court went on to hold that a hiking and biking trail is not encompassed within a grant of an easement for railroad purposes, citing cases from Illinois and Wisconsin, and concluded that "[a]pplying common law principles, we hold that a change in use from `rails to trails' constitutes abandonment of an easement which was granted for railroad purposes only. At common law, therefore, the right of way would automatically revert to the reversionary interest holders." Id. 730 P.2d at 1313.[17] The court went on to hold that a state statute which purported to prevent the ripening of the reversionary interest upon abandonment was unconstitutional as applied to the vested property rights of the plaintiffs "insofar as it purports to authorize King County to acquire without payment of just compensation existing reversionary interests which follow easements for railroad purposes only." Id. at 730 P.2d 1316.
 
 
 82
 The Court thus concluded that "King County cannot acquire the [] right of way from Burlington Northern without payment of just compensation to the reversionary interest holders. If the County takes this right of way and commences to build a recreation trail, it does so in violation of the constitution." Id. Accord Schnabel v. County of DuPage, 428 N.E.2d 671 (Ill. Ct. App. 1981); Pollnow v. State Dep't of Natural Resources, 276 N.W.2d 738 (Wis. 1979); see also National Wildlife Fed'n v. ICC, 850 F.2d 694 (D.C. Cir. 1988) (rejecting ICC argument that rails-to-trails conversions will never constitute a taking, and remanding for further consideration especially regarding easements limited to railroad use and when railroad restoration "not foreseeable").
 
 
 83
 A few courts, under the particular terms of an easement or in light of a special statute, have held otherwise. In Washington Wildlife Preservation, Inc. v. State, 329 N.W.2d 543 (Minn. 1983), plaintiffs were a group of property owners representing interests wishing to protect wildlife and other natural resources from the adverse impacts inherent in a public recreational trail. A nine mile long strip of land had been acquired in 1884 and 1885 by the original grantee railroad from a number of property owners. Thirteen or more deeds were involved. In 1980 the successor railroad conveyed the land to the State for a recreational trail. There were a number of issues in the case, including what was the estate conveyed in each of the deeds, the exact scope of those grants that were easements, and whether public recreational trails were consistent with the scope of an easement for use by a railroad. The court with little analysis declared that use of such a right-of-way for a recreational trail is consistent with the purpose for which the easements were originally acquired, public travel, and that such use imposes no additional burden on the servient estates. The court specifically pointed out that "[w]hile the grantors were undoubtedly aware that a railroad would be constructed on the land, none of the deeds limit the use to railroad purposes." Id. at 546. Furthermore, said the court, even though abandoned for railroad purposes, the easements were not abandoned for public travel purposes, including travel by hikers, bikers, cross-country skiers, and horseback riders. See also Rieger v. Penn Central Corp., No. 85-CA-11, 1985 WL 7919 (Ohio Ct. App. May 21, 1985) (general purpose of trail, public travel, is within scope of prescriptive railroad easement). Cf. Barney v. Burlington Northern R.R., 490 N.W.2d 726 (S.D. 1992) (noting that use for recreational trail of railroad easement granted by federal statute comes within definition of "public highway," thereby precluding abandonment under 43 U.S.C. Section(s) 912). For reasons peculiar to the particular circumstances, these few cases depart from the well established common law rules governing easements, and carry little persuasive authority.
 
 
 84
 Given that the easements in this case are limited by their terms and as a matter of law to railroad purposes, we are unable to join the dissent's effort to read into Vermont law a breadth of scope for the easements that is well outside the parameters of traditional common law understanding. The concept of "shifting public use" must be anchored in established precedent, or it becomes little more than speculation about what a hypothetical Vermont court in 1996 might do. Our responsibility here is to apply established law, not to make new law. If a dramatic reinterpretation of the scope of the established terms by which railroad easements were historically granted is to be imposed upon Vermont and the parties to this case, it should not be at the hand of a federal appellate court.
 
 E. Abandonment
 
 85
 Even assuming for sake of argument that the Government and the State are correct and that the so-called "doctrine of shifting public use" is available to permit reading the original conveyances in the manner for which they argue, there remains yet a further obstacle to the Government's successful defense. The Preseaults contend that under Vermont law the original easements were abandoned, and thus extinguished, in 1975. If that is so, the State could not, over ten years later in 1986, have re-established the easement even for the narrow purposes provided in the original conveyances without payment of the just compensation required by the Constitution. See, e.g., Loretto, 458 U.S. at 441. It follows that if the State could not in 1986 use the parcels for railroad purposes without that use constituting a taking, then it surely could not claim the right to use the property for other purposes free of Constitutional requirements. See Preseault 1, 24 Cl. Ct. at 835 (concluding that a "shifting public use" doctrine could not apply because of discontinuity of use of the easement by State between 1975 and 1985).
 
 
 86
 We have established that the effect of the turn-of-the-century transfers regarding Parcels A, B, and C was to create in the transferee Railroad an easement carrying the right to exclusive possession of the surface of the strips of land described in the conveyances for the limited purposes of railroad use, and to leave in the original owners of the property their fee simple estate, subject to the easement. An easement is not a possessory estate of freehold, but merely gives the easement holder a right to make use of the land over which the easement lies for the purposes for which it was granted. See 7 Thompson On Real Property Section(s) 60.02(c),(d) (David A. Thomas ed., 1994).
 
 
 87
 Typically the grant under which such rights-of-way are created does not specify a termination date. The usual way in which such an easement ends is by abandonment, which causes the easement to be extinguished by operation of law. See generally Restatement of Property Section(s) 504. Upon an act of abandonment, the then owner of the fee estate, the "burdened" estate, is relieved of the burden of the easement. In most jurisdictions, including Vermont, this happens automatically when abandonment of the easement occurs. Dessureau, 132 Vt. at 351, 318 A.2d at 653; see Preseault 1, 24 Cl. Ct. at 831, 835-36; State v. Preseault, No. S474-87 CnC, slip op. at 5, 7 (Chittenden Super. Ct. Feb. 7, 1992), aff'd on reconsideration (Chittenden Super. Ct. July 15, 1992).
 
 
 88
 Vermont law recognizes the well-established proposition that easements, like other property interests, are not extinguished by simple non-use. As was said in Nelson v. Bacon, 113 Vt. 161, 32 A.2d 140, 146 (1943), "[o]ne who acquires title to an easement in this manner [by deed in that case] has the same right of property therein as an owner of the fee and it is not necessary that he should make use of his right in order to maintain his title." Thus in cases involving a passageway through an adjoining building (Nelson), or a shared driveway (Sabins v. McAllister, 116 Vt. 302, 76 A.2d 106 (1950), overruled in part on other grounds by Lague v. Royea, 152 Vt. 499, 568 A.2d 357 (1989)), the claimed easement was not extinguished merely because the owner had not made use of it regularly.
 
 
 89
 Something more is needed. The Vermont Supreme Court in Nelson summarized the rule in this way: "In order to establish an abandonment there must be in addition to nonuser, acts by the owner of the dominant tenement conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its future existence." Nelson, 32 A.2d at 146 (emphasis added); see also Lague, 152 Vt. at 503, 568 A.2d at 359; Barrett v. Kunz, 158 Vt. 15, 604 A.2d 1278 (1992). The record here establishes that these easements, along with the other assets of the railroad, came into the hands of the State of Vermont in the 1960s. The State then leased them to an entity called the Vermont Railway, which operated trains over them. In 1970, the Vermont Railway ceased active transport operations on the line which included the right-of-way over the parcels at issue, and used the line only to store railroad cars. In 1975 the Railroad removed all of the railroad equipment, including switches and tracks, from the portion of the right-of-way running over the three parcels of land now owned by the Preseaults. See 24 Cl. Ct. at 822. In light of these facts, the trial court concluded that under Vermont law this amounted to an abandonment of the easements, and adjudged that the easements were extinguished as a matter of law in 1975.
 
 
 90
 Again, as was the case with determining the nature of the title conveyed by the Manwell deed, we are compelled to rule on the consequences of a state of facts occurring some years ago, based on the law of Vermont, law that must be extracted from cases none of which are directly on point. Under Vermont law, "the question whether there has been an abandonment . . . is one of fact," Lague, 152 Vt. at 503, 568 A.2d at 359 (citation omitted), and "[t]he fact that the question relates to a right of way taken by a railroad company does not make it one of law," Stevens v. MacRae, 97 Vt. 76, 122 A. 892 (1923).
 
 
 91
 The underlying facts regarding this question are undisputed. As noted, Vermont denominates the question of abandonment as one of fact. The parties are in dispute over whether an abandonment occurred. Does this preclude summary judgment? We think not. Abandonment, though a fact question under Vermont law, is a factual conclusion based on inferences to be drawn from the undisputed evidence regarding the historical events. Nothing would be gained by requiring a further proceeding at the trial level, since the parties had full opportunity to establish all relevant underlying facts. Trial would not enhance the court's ability to draw factual inferences and conclusions. Nor, since this is a non-jury matter, does permitting the trial judge to rule on summary judgment have the effect of denying a party the right to have the issue decided by jury.
 
 
 92
 In light of the facts before her and the arguments presented by the parties, the trial judge arrived at the conclusion that the facts meet the test of Vermont law, in that they manifest, conclusively and unequivocally, the requisite intent or purpose of the Railroad to abandon the easement in 1975. Although the trial judge held several evidentiary hearings, and in her two opinions in the case discussed the facts extensively, in response to the motions before her she denominated her decision a summary judgment, rather than a decision on the merits following trial. Our task, then, given an extensive factual record, is to review on appeal of a summary judgment a disputed factual conclusion reached by the trial court.
 
 
 93
 Obviously, if there is a genuine dispute over a material evidentiary fact, summary judgment is precluded. If the disputed factual issue is one of ultimate fact, calling for a factual conclusion, and on appeal summary judgment is deemed appropriate as is the case here, the question arises as to how much deference should be accorded the trial judge's conclusion. The Supreme Court in its leading case on summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), did not directly address the question. In other Circuits the question remains to be decided. The Fifth Circuit recently reviewed its cases on the question, without resolving whether such a conclusion is reviewable for clear error under Rule 52, Fed. R. Civ. P. See United States Fidelity & Guaranty Co. v. Planters Bank & Trust Co., 77 F.3d 863, 865 (5th Cir. 1996). No case in this court has resolved the question. Cf. Loglan Inst., Inc. v. Logical Language Group, Inc., 962 F.2d 1038, 1040 (Fed. Cir. 1992) (summary judgment affirmed); Amhill Enterprises Ltd. V. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996) (summary judgment of no literal infringement affirmed under the clearly erroneous standard of review); Lemelson v. TRW, Inc., 760 F.2d 1254 (Fed. Cir. 1985) (summary judgment found inappropriate and case remanded for trial).
 
 
 94
 We need not determine this issue for all time and for all cases. The question to be decided here is what was the intent or purpose of the Railroad in 1975, when, for all practical purposes, it ended railroad operations on this easement. It is enough, under the circumstances of this case and given the fullness of the factual record before the trial judge, as well as her carefully-considered analysis, that we here accord her traditional deference for factual determinations, and test her judgment against the usual standard of clear error. To do less would embroil this court in determining factual matters more intensively than customary for appellate courts, a position for which appellate courts are ill-equipped.[18]
 
 
 95
 As noted, in 1970 the Vermont Railway ceased using the easement for active transport operations and used the tracks solely to store railroad cars, as the only freight customer serviced on that portion of the line had moved from the area. In 1975, Vermont Railway removed the rails and other track materials from the segment of line crossing the Preseaults' property.
 
 
 96
 In the 1985 proceedings before the ICC, the State of Vermont and Vermont Railway filed a Verified Notice of Exemption (Corrected) dated December 16, 1985, in which they stated that
 
 
 97
 no local traffic has moved over the line for at least two years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a State or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Commission or any U.S. District Court or had been decided in favor of the complainant within the two-year period.
 
 
 98
 Preseault 1, 24 Cl. Ct. at 823. The State sought approval from the ICC for a 30-year lease with the City of Burlington, indicating that the State fully recognized that railroad operations had ceased on the easement, and that none were contemplated in the foreseeable future. Although events occurring after 1975 cannot change the consequences of the facts then in place, these later declarations confirm the conclusion that the purpose of the Railroad's actions leading up to the track removal in 1975 was to abandon this stretch of rail line.
 
 
 99
 The Government and the State argue that there are facts inconsistent with that determination, but we are not persuaded that any of them significantly undercut the trial court's conclusion. For example, when the Vermont Railway removed its tracks in 1975, it did not remove the two bridges or any of the culverts on the line, all of which remained "substantially intact." That is not surprising. The Railroad was under no obligation to restore the former easement to its original condition. Tearing out existing structures would simply add to its costs, whereas the rails that were taken up could be used for repairs of defective rails elsewhere on the line. It is further argued that, since the rail line continues to operate to a point approximately one and one-third miles south of the Preseaults' property, it is possible to restore the line to full operation. The fact that restoration of the northern portion of the line would be technically feasible tells us little. The question is not what is technically possible to do in the future, but what was done in the past.
 
 
 100
 Almost immediately after the tracks were removed, members of the public began crossing over the easement. Perhaps illustrating the difficulty in getting government paperwork to catch up with reality, or perhaps indicating that revenue collectors do not give up easily, the State of Vermont and Vermont Railway, as they had done before the removal of the tracks, continued to collect fees under various license and crossing agreements from persons wishing to establish fixed crossings. In January 1976, the Preseaults executed a crossing agreement with the Vermont Railway which gave the Preseaults permission to cross the right-of-way. In March 1976, the Preseaults entered into a license agreement with the State and the Vermont Railway to locate a driveway and underground utility service across the railroad right-of-way. As late as 1991, 985 Associates (through Paul Preseault) paid a $10 license fee to "Vermont Railroad" (sic), presumably pursuant to one of the 1976 agreements. The Preseaults paid "under protest." Much of this activity suggests that, initially at least, the adjacent property owners decided it was cheaper to pay a nominal license fee to the State than to litigate the question of whether the State had the right to extract the fee.[19] In view of all the contrary evidence of physical abandonment, we find this behavior by the State's revenue collectors unconvincing as persuasive evidence of a purpose or intent not to abandon the use of the right-of-way for actual railroad purposes.
 
 
 101
 One uncontrovertible piece of evidence in favor of abandonment is that, in the years following the shutting down of the line in 1970 and the 1975 removal of the tracks, no move has been made by the State or by the Railroad to reinstitute service over the line, or to undertake replacement of the removed tracks and other infrastructure necessary to return the line to service. The declarations in the 1985 lease between the State of Vermont, Vermont Railway, and the City of Burlington, which refer to the possible resumption of railroad operations at some undefined time in the future are of course self-serving and not indicative of the facts and circumstances in 1975. Other events occurring after 1975 are also of little probative value.[20]
 
 
 102
 As noted, there are no Vermont cases addressing directly the state of facts presented here. Several cases did deal with railroad rights-of-way and the question of whether there had been an abandonment. In Stevens v. MacRae, 97 Vt. 76, 122 A. 892 (1923), the issue was the location on the defendant's farm, acquired from the original grantor, of the plaintiff's right-of-way for ingress and egress. That right-of-way had been granted earlier with relation to a piece of the farmland sold to plaintiff. The deed to the plaintiff stated that the right-of-way was on the grantor's "other lands." There was also a railroad easement running through the farm. Since the ingress easement under the terms of plaintiff's deed was to be on the grantor's "other lands," the court stated that that part of the property over which the railroad easement ran, and was still owned by the railroad, would not be considered part of those "other lands." It had been some years since the railroad easement had been used by the railroad, but, consistent with the general rule, the court stated that mere non-user did not terminate the railroad's rights, and in absence of a factual finding of abandonment, the court could not say that the railroad right-of-way was part of the grantor's "other lands."
 
 
 103
 In Stacey v. Vermont Central Railroad., 27 Vt. 39 (1854), the question was whether the railroad owed the landowner the value of the right-of-way the railroad initially surveyed over his land, but then decided not to use in favor of a different alignment over nearby land. The court held that
 
 
 104
 [t]hat change in the line of their road, however, will operate as an abandonment of their former survey on the plaintiff's land, so that the company can no longer claim any right or interest in the land itself, or to any easement growing out of it, in consequence of that survey having been made.
 
 
 105
 Id. at 43. As a result, the railroad was not liable.
 
 
 106
 Perhaps the closest case to the matter before us is the relatively recent case of Proctor v. Central Vermont Public Service Corp., 116 Vt. 431, 77 A.2d 828 (1951). In that case, the landowner brought an action in trespass against the electric company for, inter alia, maintaining its wires and poles over plaintiff's land without legal authority. The electric company had placed them along an old right-of-way belonging to a railroad, and claimed that it thus was entitled to use the right-of-way for electric distribution purposes. One question, then, was whether the right-of-way had been abandoned. The court addressed this issue by
 
 
 107
 paus[ing] but briefly over the matter of abandonment. Removal of the tracks twenty-three years before this suit was brought, absence of tracks since their removal, and nonuse for railroad purposes for twenty-five consecutive years is conclusive that the premises were abandoned for railroad uses not later than the time that the tracks were removed. Much citation of authority would be superfluous . . . .
 
 
 108
 Id. 77 A.2d at 830. Proctor makes clear that it is no more difficult for a railroad to abandon an easement than any other owner of one. It is simply a question of determining whether, on the facts, there was sufficient evidence of either an intent to relinquish the easement or of a purpose inconsistent with its future existence. Nelson, 32 A.2d at 146. (The court ultimately held that since Vermont statutes expressly provided for electric transmission as part of a railroad right-of-way, the original compensation paid the landowner's predecessors in title included that indemnification, and the landowner had no cause of action.)
 
 
 109
 The trial judge in this case, after extensive recitation of the undisputed facts, and after reviewing cases such as Proctor, concluded that as a fact the Railroad had effected in 1975 an abandonment of the easement running over parcels A, B, and C. Even without giving the trial judge the deference due her, our review of the facts and circumstances leading up to the events of 1975 persuades us that the trial judge is correct. When we accord the trial judge due deference with regard to this factual determination, there is hardly a basis for finding clearly erroneous her conclusion that an abandonment of the easements occurred. The dissent chooses to de-emphasize the important facts that the trial judge, and we, find controlling, and to emphasize other, less important, facts. We find the dissent's argument as well crafted as the argument can be made, but nevertheless unpersuasive. Furthermore, contrary to where the dissent places its emphasis, we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use. We affirm the determination of the trial court that abandonment of the easements took place in 1975. That determination provides an alternative ground for concluding that a governmental taking occurred.
 
 E. The Taking
 
 110
 The Preseaults had acquired Parcel C, the Manwell Parcel, in 1966. At that time it was still subject to the railroad's easement. In 1975, following the abandonment by the railroad of the easement across Parcel C, the Preseaults owned Parcel C in fee simple free of the encumbering easement. The Preseaults acquired Parcels A and B in 1980. At that time the easement had been extinguished for five years; the parcels they purchased were in fee simple, again free of the encumbrance.
 
 
 111
 Ten years later, in June 1985, the State of Vermont Agency of Transportation, joined by the Vermont Railway, as lessors, and the City of Burlington as lessee, entered into a lease by which the lessors purported to lease the former right-of-way over Parcels A, B, and C to the City of Burlington for use as a bicycle and pedestrian path. A month later the Preseaults and several neighbors filed a petition with the ICC (now the Surface Transportation Board[21] ) for a determination of exemption from the jurisdiction of the ICC and for a certification of abandonment of the rail line. (The Vermont Railway had never sought ICC approval before abandoning operations on the line.) The State of Vermont intervened in the ICC proceeding, and petitioned the ICC to permit Vermont Railway to discontinue rail service and to transfer the right-of-way to the City of Burlington for use as a public trail. The authority for such action was section 8(d) of the National Trails System Act, 16 U.S.C. Section(s) 1247(d), an act establishing a nationwide system of nature and recreational trails.
 
 
 112
 To comply with the ICC's procedural requirements, the State and Vermont Railway formally acknowledged that the line was no longer used by the railroad, and that there had been no formal complaint by users regarding the cessation of service. The ICC in a January 1986 Order authorized Vermont Railway ex post facto to discontinue service, and approved the agreement between the State and the City of Burlington for trail use of the former right-of-way. Subsequently, the ICC denied the Preseaults' reconsideration motion, acknowledging that trail use "will conflict with the reversionary rights of adjacent land owners, [and noting that this] is the very purpose of the Trails Act." Vermont & Vermont Ry.--Discontinuance of Service Exemption--In Chittenden County, Vt., 3 I.C.C.2d 903, 908 (1987).
 
 
 113
 In due course an eight foot wide paved strip was established on the former right-of-way over Parcels A, B, and C. The path is some 60 feet from the Preseaults' front door. On each side of the Preseaults' driveway, where it crosses the easement, two concrete posts and one metal post were installed to block automobile traffic. The city also erected two stop signs on the path and built a water main under and along the path. The Preseaults have been unable to build on the land under the easement or to construct a driveway connecting their land through Parcels A and B to the nearest public street.
 
 
 114
 The path is used regularly by members of the public for walking, skating, and bicycle riding. On warm weekends up to two hundred people an hour go through the Preseaults' property. People using the path often trespass on the Preseaults' front yard. On one occasion Mr. Preseault was nearly run over by a cyclist as he walked across the path.
 
 
 115
 In her concurring opinion in Preseault II, Justice O'Connor made the point that:
 
 
 116
 [t]he scope of the Commission's authority to regulate abandonments, thereby delimiting the ambit of federal power, is an issue quite distinct from whether the Commission's exercise of power over matters within its jurisdiction effected a taking of petitioner's property. . . . The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights. Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth amendment.
 
 
 117
 Preseault II, 494 U.S. at 22 (O'Connor, J., concurring) (citations omitted).
 
 
 118
 Thus, if the Preseaults have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. The record establishes two bases on which the Preseaults are entitled to recover. One, if the easements were in existence in 1986 when, pursuant to ICC Order, the City of Burlington established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. See, e.g., Lawson v. State, 730 P.2d 1308 (Wash. 1986). Either way, the result is the same * a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.
 
 
 119
 Two, as an alternative basis, in 1986 when the ICC issued its Order authorizing the City to establish a public recreational biking and pedestrian trail on Parcels A, B, and C, there was as a matter of state law no railroad easement in existence on those parcels, nor had there been for more than ten years. The easement had been abandoned in 1975, and the properties were held by the Preseaults in fee simple, unencumbered by any former property rights of the Railroad. When the City, pursuant to federal authorization, took possession of Parcels A, B, and C and opened them to public use, that was a physical taking of the right of exclusive possession that belonged to the Preseaults as an incident of their ownership of the land.
 
 
 120
 The Government argues that, since it was the City that actually established the trail, the United States should not be considered the responsible actor. If a taking occurred, says the Government, it was the City and the State who did it. In Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991), the U.S. Environmental Protection Agency issued an Order which, among other things, authorized and directed the State of California to enter upon the land of the Hendlers, disregarding their objections, and establish monitoring wells. The State did so. In response to the Hendlers' takings claim against the United States, the Government argued, inter alia, that it could not be held responsible for what California did since the state could have entered under its own authority, and did not need the EPA Order.
 
 
 121
 We rejected the argument. We pointed out that pursuant to the Government's Order California entered on the property and dug and serviced deep wells. When California acted pursuant to the Order, it acted under the aegis of the United States, and its actions were, for purposes of takings liability, the actions of the United States. That it could have acted on its own was immaterial.
 
 
 122
 In the case before us there was a similar physical entry upon the private lands of the Preseaults, acting under the Federal Government's authority pursuant to the ICC's Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid.
 
 
 123
 As previously noted, when the Preseaults and other affected landowners first sued in the Vermont state courts for a determination of ownership rights as between themselves and the Railroad (then owned by the State), the Vermont Supreme Court held that it was without subject matter jurisdiction since the matter was exclusively one within federal control. Trustees of the Diocese of Vermont v. State, 145 Vt. 510, 496 A.2d 151 (1985). In the subsequent litigation against the Federal Government, the Federal Government never denied its role, and indeed, as was previously explained, in arguing the case before us staked its position on the grounds of total federal control over railroads and railroad rights-of-way. Both the State and the Federal Governments were fully invested in the effort to create this public trail. It would be absurd to deny the Preseaults their Constitutional rights on the grounds that the State has concluded it was the Federal Government who did it, and the Federal Government has concluded it was the State. In sum, the Government cannot now point its finger at the State and say "they did it, not us." As in Hendler, when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions.
 
 
 124
 A final argument made by defendants is based on a 1982 state statute which authorizes, indeed instructs, the State to retain any unused railroad rights-of-way it owns for future transportation uses, and in the meantime to use them for other public purposes not inconsistent with future transportation purposes.[22] That is what the State purports to have done, and presumably would have done with or without the statute. Defendants argue that the statute makes the action proper.
 
 
 125
 One can hardly fault the State government for complying with its law. However, the statute does not say that such actions are without consequences to the property owners, nor does it say that the property owners will not, or must not, be compensated for such actions. The statute is in fact wholly silent on the question of compensation. Obviously the State could not simply by enactment of a statute immunize itself from the salutary provisions of the Fifth Amendment.[23] The issue is not whether the State or Federal governments had the power or obligation to do what they did, but whether the Constitution requires that just compensation be paid as a consequence. The existence of the statute thus adds nothing to the Government's defense.[24]
 
 SUMMARY AND CONCLUSION
 
 126
 It is important to understand what we here decide, and what remains to be dealt with in future cases. The plenary regulatory authority that the Federal Government exercises over the activities, such as cessation of service on a particular rail line, of interstate rail carriers under the Government's Constitutional powers pursuant to the Commerce Clause, U.S. Const., art. I, Section(s) 8, is not here challenged. But the exercise of that authority does not dispose of the question of the compensability of state-defined rights of private citizens who own land subject to an easement for railroad use. When state-defined property rights are destroyed by the Federal Government's preemptive power in circumstances such as those here before us, the owner of those rights is due just compensation.
 
 
 127
 We do not hold that every exercise of authority by the Government under the Rails-to-Trails Act necessarily will result in a compensable taking. Obviously if the railroad owns the right-of-way in fee simple, there is no owner of a separate underlying property interest to claim the rights of the servient estate holder. And even if an easement rather than fee title is the nature of the property interest held by the railroad at the time of the conversion to a public trail, if the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose.
 
 
 128
 Whether, at the time a railroad applies to abandon its use of an easement limited to railroad purposes, a taking occurs under an ICC order to "railbank" the easement for possible future railroad use, and allowing in the interim for use of the easement for trail purposes, is a question not now before us. We offer no opinion at this time on that question.[25] We conclude that the occupation of the Preseaults' property by the City of Burlington under the authority of the Federal Government constituted a taking of their property for which the Constitution requires that just compensation be paid. Neither the Government nor the State of Vermont have demonstrated a valid reason why the Preseaults are not entitled to what the Constitution mandates. The judgment of the Court of Federal Claims, holding the Government not liable, is reversed. The matter is remanded to that court for further proceedings consistent with this opinion.
 
 REVERSED AND REMANDED
 
 129
 RADER, Circuit Judge, concurring, with whom LOURIE, Circuit Judge, joins.
 
 
 130
 I too would reverse the Court of Federal Claims' holding that the Government is not liable for the uncompensated taking of the Preseaults' property. I write separately, however, to highlight the issues upon which I believe this case turns.
 
 
 131
 As an initial note, this court took this case en banc to determine whether federal or state law defined the Preseaults' property rights. The decision of the court determines the nature of the Preseaults' property rights through the application of Vermont law. Therefore, this court has properly selected the well from which it can draw its interpretive law.
 
 
 132
 In this court's panel opinion, the majority held that federal transportation law preempts Vermont law in establishing when possession of the right-of-way reverts from the State to the Preseaults. Preseault v. United States, 66 F.3d 1167 (Fed. Cir.), withdrawn, 66 F.3d 1190 (Fed. Cir. 1995). The majority of the panel held that federal law provides "background principles" -- in the instant case pre-1979 federal ICC law -- that change the property rights held by the Preseaults' and place additional conditions on the abandonment of the railroad easement beyond those rooted in Vermont law. Id. The vacated opinion allowed the federal involvement in railroad regulation to dictate the nature of the Preseaults' property interests. Because this alteration of rights required the Government to provide just compensation, I dissented. While federal legislation may alter the terms of the Preseaults' property rights defined and created by state law, it cannot do so without giving just compensation. See Kaiser Aetna v. United States, 444 U.S. 164, 178-80 (1979). Certainly, the Federal Government has the power to enact legislation that affects the Preseaults' right to freely use or possess land. But the Government cannot use this power for uncompensated, piecemeal usurpation of the rights of property owners, such that with each transfer of the property the purchaser loses sticks within the original bundle of rights yet remains without Constitutional recourse. Simply, when the Federal Government intrudes upon a property owner's right of use or possession of property, the Federal Government must pay just compensation. In this case, the offending laws are the Transportation Act of 1920, Ch. 91, 41 Stat. 456 (1920), the Rail Revitalization and Regulatory Reform Act, Pub. L. No. 94-210, 90 Stat. 31 (1976), and the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, Title II, 97 Stat. 42 (1983), each of which took or authorized a complicit state government to take a share of the property right.
 
 
 133
 In the continuing evolution of this litigation, the court now correctly sets its sights on the question of abandonment, a point that both the opinion for the court and the dissent agree turns on issues of Vermont law. Briefly, and as stated in the opinion of the court, the owners of the parcel at issue held a fee simple subject to the easement rights created in 1899. The easement, created under Vermont law, created a right-of-way for the construction, maintenance, and accommodation of the Rutland-Canadian Railroad. Under Vermont law, the easement "would cease and the land revert, the moment it was put to any other use than the one designated in the charter or statute, by or under which the appropriation was made." Hill v. Western Vt. R.R., 32 Vt. 68, 77 (1859). The court here is charged with determining whether, under the law of the State of Vermont, the Preseaults have demonstrated the State's intent to abandon the easement. See Lague, Inc. v. Royea, 568 A.2d 357, 358 (Vt. 1989) (stating that Vermont law requires that abandonment be demonstrated by "a present intent to relinquish the easement or a purpose inconsistent with its future existence") (quoting Nelson v. Bacon, 32 A.2d 140, 146 (Vt. 1943)).
 
 
 134
 The facts are undisputed. As evidence of abandonment, in 1970, active railway transportation ceased over the easement. In 1975, the State removed the railroad tracks and switches. As evidence mitigating against a holding of abandonment, after the State removed the tracks, it continued to collect rents under pre-existing license and crossing agreements. In addition, although the tracks were removed from the Preseaults' property, tracks remained in place in close proximity to the parcels at issue. In 1982, the State legislature enacted a statute purporting to maintain possession of railroad easements notwithstanding the cessation of railroad operations. The 1982 Act purports to apply retroactively. If, however, the easement was abandoned in 1975, then the activities of the State legislature could not resurrect the easement through legislation.
 
 
 135
 Under Vermont law, abandonment is a question of fact. Lague, 568 A.2d at 359. Because the parties did not show the existence of any disputed material fact, the court need not remand this case for additional discovery or presentation of evidence; the available record is sufficient to review the lower court's granting of summary judgment. A factual question, such as a determination of abandonment, is reviewed for clear error. Herein, the trial judge found that the easements were abandoned upon the removal of the tracks and other equipment in 1975.
 
 
 136
 While it is not disputed that an easement will not be extinguished through mere non-use, removing the tracks and switches from a railway cannot be termed non-use. Non-use of the easement began in 1970 ; abandonment occurred, as evidenced by the more permanent lack of operability, in 1975. I cannot say that the grant of summary judgment on that issue is in error.
 
 
 137
 Ultimately, and as a final indication of abandonment, I note the difference in the current use of the easement from that originally granted. The opinion of the court and the dissent dispute the applicability under Vermont law of the doctrine of shifting public use. However, even if the doctrine is applicable, a public trail is a use distinguishable from that of a railroad.
 
 
 138
 The dissent relies on Brainard v. Missisquoi R.R. Co., 48 Vt. 107 (1874), in which the Supreme Court of Vermont held that an easement for a plank road was not abandoned when the plank road was removed and railroad tracks were installed. The court held that since the easement served the same purpose to the public, i.e. transportation, there was no abandonment of the original easement. In the instant case, the State has held the easements for two purposes, public recreation and preservation of unobstructed transportation corridors. As to the former, the dissent insists that bicycling and walking fit within the shifting public use doctrine as alternative modes of transportation. While there is some dispute over the comparative burden of scheduled rumbling freight trains versus obnoxious in-line rollerskaters, the issue can be resolved on simpler terms. Realistically, nature trails are for recreation, not transportation. Thus, when the State sought to convert the easement into a recreational trail, it exceeded the scope of the original easement and caused a reversion.
 
 
 139
 As to the latter, otherwise known as railbanking, the dissent relies upon the 1982 Act to note the State's intention to keep the rights-of-way. However, the State's belated statement of intent, seven years after it exhibited an unequivocal intent to abandon the easement, cannot revive the property right. Moreover, the State's transparent attempt to retain property condemned for a narrow transportation use crumbled when it converted that property to a recreational use. The 1982 Act could not immunize the State from the consequences of exceeding the scope of the easement. As such, little by little, through federal regulation and state legislation, the United States and Vermont have converted a right to use the Preseaults' land for a railroad into a right to hold the land in perpetuity. The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement. That conversion demands compensation. Moreover, the United States facilitated that conversion with its laws and regulatory approval.
 
 
 140
 For the reasons stated above, I would reverse the opinion of the Court of Federal Claims and remand for a proper assessment of damages.
 
 
 141
 CLEVENGER, Circuit Judge, dissenting, joined by Circuit Judges MICHEL and SCHALL.
 
 
 142
 This case asks whether J. Paul and Patricia Preseault (Preseaults) own property that has been taken in violation of their Fifth Amendment rights as a result of the use of an old railroad right-of-way which crosses their land as a public walking and bicycle trail, while the right-of-way is held for future rail use.
 
 
 143
 The State of Vermont (State) cross-appeals from the decision of the United States Court of Federal Claims granting the Preseaults' motion for partial summary judgment, and denying the cross-motions of the State and the United States for summary judgment in Preseault v. United States, 24 Cl. Ct. 818 (1992). The State's appeal challenges the threshold decision of the Court of Federal Claims that the Preseaults currently possess a compensable property interest. The United States joins in the arguments made by the State, and responds to the Preseaults' appeal from a second decision of the Court of Federal Claims, Preseault v. United States, 27 Fed. Cl. 69 (1992), dismissing on the merits their complaint, which sought just compensation for the alleged taking by the United States of their real property. The second decision held that no taking by the United States of the Preseaults' property results from the presence of the trail. Because I would rule in favor of the State on its cross-appeal, I would dismiss the Preseaults' appeal as moot, and remand the case with instructions to dismiss the Preseaults' complaint for failure to state a claim upon which relief can be granted.
 
 
 144
 By a vote of six to three, the court holds that the Preseaults are entitled to compensation from the United States for its taking of their property. Judge Plager's opinion is joined by Judges Rich, Newman and Mayer. His opinion seeks to explain why the easements were terminated in 1975, and why the events in 1985 amount to a federal taking. Judge Rader's opinion is joined by Judge Lourie. His conclusory opinion agrees completely with the result reached by Judge Plager, without expressing any reasoning or analysis of the pertinent facts. On the state law issues, I must assume that Judge Rader adopts the underpinnings of Judge Plager's opinion. For convenience, then, the judges not joining my opinion will hereafter together be identified as the "plurality judges."
 
 
 145
 I necessarily conclude that the plurality judges find some flaw in my opinion. There must, however, be some flaw in Judge Plager's opinion, for otherwise there seems to be no explanation for the unwillingness of Judges Rader and Lourie to join it.
 
 
 146
 In short, after nearly a year of in banc consideration, the case is decided with no majority opinion of the court. The Preseaults have a victory, but the court's holding has no precedential value.
 
 I.
 
 147
 At the heart of this case is the use of a railroad right-of-way as a current walking and bicycle trail, pursuant to a contract which preserves the easement for future rail use (a concept known as "railbanking"), while allowing the interim trail use. The owners of the land over which the current trail crosses contend that the presence of the trail under color of federal law violates their rights under the takings clause of the Fifth Amendment to the U.S. Constitution.[1]
 
 
 148
 Whether the Preseaults presently have a justiciable Fifth Amendment claim, however, depends upon whether the right-of-way has been abandoned. This is so, because if the right-of-way still exists, and if the current use of the original right-of-way is permissible under Vermont law, then the Preseaults would have no present right to claim ownership of the underlying land, free of the burden on their property created by the trail. In short, their takings claim would be unripe and therefore moot.[2]
 
 
 149
 Indeed, the United States Supreme Court seems to have had this very issue in mind when it addressed another aspect of this case. As Justice Brennan, writing for the Court, noted:
 
 
 150
 Other[] [rights-of-way] are held as easements that do not even as a matter of state law revert upon interim use as nature trails. Some state courts have held that trail use does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights.
 
 
 151
 Preseault v. ICC, 494 U.S. 1, 16 & n.9 (1989). Similarly, Justice O'Connor, writing for herself and Justices Scalia and Kennedy, noted:
 
 
 152
 [T]he parties sharply dispute what interest, according to Vermont law, the State of Vermont acquired from the Rutland Railway Corporation and, correspondingly, whether petitioners [Preseaults] possess the property interest that they claim has been taken. . . . Similar reference to state law has guided other courts seeking to determine whether a railroad right of way lapsed upon the conversion to trail use. Compare State by Washington Wildlife Preservation, Inc. v. State, 329 N.W.2d 543, 545-48 (Minn.) (trail use within original interest, thus reversionary rights have not matured), cert. denied, 463 U.S. 1209 (1983), with Lawson v. State, 107 Wash. 2d 444, 730 P.2d 1308 (1986) (change in use would give effect to reversionary interests).
 
 
 153
 Id. at 20-21 (O'Connor, J., concurring) (some citations omitted).
 
 
 154
 In order to ascertain the nature of the Preseaults' present property interest, we must examine state law, in this case, the law of Vermont, the site of the property in question. Absent circumstances in which a federal land right is claimed, not here present, it is state law that creates the property rights to which Fifth Amendment rights attach. Lucas v. South Carolina Coastal Council 505 U.S. 1003, 1030 (1992).
 
 II.
 
 155
 The state property law issues in this case are complex: hence the length of this opinion. Before proceeding further, it will be useful for me to synopsize the opinion, so that the issues and their correct resolution will be clear.
 
 
 156
 The easements in question were created in the 1890's. The Court of Federal Claims concluded that the easements were terminated in 1975 when the railroad removed the tracks which ran over the easements. Accordingly, the Preseaults enjoyed fee simple absolute ownership of their land. In so concluding, the court erred as a matter of law.
 
 
 157
 Under Vermont law, easements are terminated if the owner's conduct emits a clear and unequivocal signal of abandonment. In this case, the Court of Federal Claims looked only to the fact of track removal, and held it to supply the requisite signal of abandonment. The court erred, both in its reading of Vermont law on the subject, and in overlooking undeniable and uncontested facts which make it impossible to conclude that the easements were terminated in 1975. Consequently, the easements survived the removal of the tracks.
 
 
 158
 The next slice of Vermont property law that must be appreciated is that an easement is not terminated simply by its nonuse. Hence, from 1975 forward, the easements remained alive even when not in active use. This is important, because from the State's point of view, retention of the easements fulfilled the State's longstanding legislative policy of preserving such easements for future public uses. Indeed, in 1982, the State enacted a specific law which requires the State to retain its easements when railroad operations cease on the rights-of-way. This law is quite simple, and it has retroactive application to the Preseaults' property. The law mandates that the easements in question, which belonged to the State in 1982, be retained by the State for future transportation uses (not limited just to railroad transportation) and the law permits uses that are not inconsistent with future transportation uses.
 
 
 159
 After 1982, by force of the state legislation, the easements remained in effect. Under state law, the easements surely can be held in inventory ("railbanking") for future uses, and the use of the easements as a walking and bicycle trail is not inconsistent with future transportation uses. As a matter of state legislation, then, the easements over the Preseaults' property have not been terminated.
 
 
 160
 In addition, and alternatively, Vermont common law compels the same conclusion that the easements have not been terminated. The existence of the trail imposes no greater burden on the servient tenement than that which existed when the easements were used for active commercial freight operations, or thereafter as an idle storage facility for rolling stock. Just as many property law issues require lengthy explanation, so it is with the Vermont common law applicable to this case. My discussion of this point, below, is therefore quite long.
 
 
 161
 The Preseaults chose to sue the United States for the alleged harm to their property caused by the trail. They did not, as they could have, sue the State for its involvement in perpetuation of the easements. In my view, the role of the United States in the creation of the trail is de minimis. Here, the State developed and enforced a state policy of preserving old rail easements for future transportation uses. The contract parties to the creation of the trail include only state agencies. The hours and conditions of use of the trail are controlled by the contract parties, and the involvement of the United States is limited to providing federal consent to uses of the easements that are compelled by state law. No property interest of the Preseaults has been, or is, occupied by the United States. The federal government has not dictated the results here: if a government has taken the Preseaults' property without compensation, it would seem to be the State of Vermont.
 
 III.
 
 162
 The background facts of this case, including precise descriptions of the land owned by the Preseaults, are stated at length in the two opinions of the Court of Federal Claims, as well as in other opinions dealing with issues preliminary to the litigation in the Court of Federal Claims. See Preseault v. ICC, 494 U.S. 1 (1990); Preseault v. ICC, 853 F.2d 145 (2d Cir. 1988); State v. Preseault, 652 A.2d 1001 (Vt. 1994); Trustees of the Diocese of Vermont v. State, 496 A.2d 151 (Vt. 1985). After a panel of this court had decided the instant appeals, see Preseault v. United States, Nos. 93-5067, 93-5068 (Fed. Cir. Sept. 14, 1995), we vacated the panel's opinion and ordered the case reheard in banc, see Preseault v. United States, 66 F.3d 1190 (Fed. Cir. 1995).
 
 
 163
 The dispute concerning the property in question dates back to 1898, when the General Assembly of Vermont chartered the Rutland-Canadian Railroad Company (RCRC), giving it the right of eminent domain and authorizing it to acquire a right-of-way to construct and operate a railroad connecting the City of Burlington, Vermont and the town of Alburgh, Vermont.[3] In 1899, the RCRC used its eminent domain power to acquire a right-of-way over land owned by the William H.M. Barker Estate. In the same year, the RCRC acquired a right-of-way over the land of Mr. and Mrs. Frederick Manwell by warranty deed. The Preseaults now own the land over which the 1899 rights-of-way ran; their chain of title traces back to the Manwell grantors and the Barker condemnees. The rights-of-way originally acquired by the RCRC were transferred to the Rutland Railroad Company in 1900, then to the Rutland Railway Corporation in 1950, and finally to the State in 1963, pursuant to a statute authorizing the State's purchase of the Rutland Railway Corporation. The 1963 statute expressly authorized use of the subject rights-of-way "for continuous operation of a railroad, or other public purpose, provided, if necessary, approval for such . . . other public purpose, is granted by the Interstate Commerce Commission of the United States. 1963 Vt. Acts No. 162, Section(s) 4. The State then leased the rights-of-way to Vermont Railway, Inc., which operated train service over the rights-of-way until 1970, and thereafter used the rights-of-way until 1975 for the storage of railroad cars. The rails on the rights-of-way were removed in 1975. The City of Burlington in 1985 constructed a public walking and bicycle trail across several pieces of State-owned property, alongside existing active railroad tracks, and over the roadbed on the Preseaults' property from which the tracks had been removed.
 
 
 164
 Much of the argument in the State's appeal addresses the question of whether, pursuant to the 1899 conveyances, the RCRC obtained easements, on the one hand, or fee simple absolute interests, on the other hand, and in particular whether the Manwell warranty deed passed a fee simple absolute interest to the RCRC. The State hopes that this court will hold, as a matter of state law, that the 1899 transactions created such fee simple absolute interests in the RCRC. Were that the case, the Preseaults of course could not complain about the State's present use of its own fee simple absolute property. For the reasons given in the opinion of the Court of Federal Claims, see Preseault, 24 Ct. Cl. at 826-27, I conclude that the Barker Estate condemnation transaction created an easement. Since I conclude, for the reasons set forth below, that the State has not abandoned its easement over the Barker portion of the Preseaults' property, and since no distinction is made between the character of the Barker easement and that which would cover the Manwell tract, were it an easement, it is not necessary to decide whether the Manwell transaction created an easement or a fee simple absolute interest in the RCRC.
 
 IV.
 
 165
 The dispositive State law question in the State's appeal is whether, on the undisputed facts before the Court of Federal Claims, the easements have been extinguished by the acts of the State. If the State is correct that, as a matter of law, no abandonment, and thus no extinguishment, has occurred, the Preseaults' present takings claim is defeated.
 
 
 166
 Vermont law relating to the abandonment of railroad easements is carefully defined. Only the application of that law to the facts of this case is disputed. Resolution of that dispute requires us, as it did the Court of Federal Claims, to reach the conclusion that the Supreme Court of Vermont would reach were it required to adjudicate this particular dispute. At this point, a brief statement of the relevant Vermont law will suffice.
 
 A.
 
 167
 Concerning common law abandonment, in Vermont, an easement "cannot be extinguished by nonuse alone, no matter how long it continues." Lague, Inc. v. Royea, 568 A.2d 357, 358 (Vt. 1989). In addition:
 
 
 168
 [t]he burden on the party claiming an abandonment of an easement is a heavy one: Such an abandonment may be established only by "acts by the owner of the dominant tenement conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its future existence." Id. 568 A.2d at 359 (quoting Nelson v. Bacon, 32 A.2d 140, 146 (Vt. 1943)). Whether an easement has been abandoned is a question of fact to be determined on the evidence, Stevens v. MacRae, 122 A. 892, 894 (Vt. 1923), and the burden of proof that an easement has been abandoned is, of course, on the party asserting abandonment, Nelson, 32 A.2d at 146. When the facts of a given case show that an easement has been abandoned, its extinguishment is automatic, without need of any other act, administrative or otherwise. Hill v. Western Vermont Railroad Co., 32 Vt. 68, 74 (1859).[4] The conclusion that an easement has been extinguished, based on facts that spell abandonment, is thus a question of law in Vermont. These propositions of law are well-settled in Vermont; there can be no doubt as to their full viability.
 
 
 169
 The Court of Federal Claims noted that active transportation services ceased on the easements over the Preseaults' land in 1970. From 1970 to 1975, the easements were used to store railroad cars. While not a direct transportation service, the storage of the cars put the easement to active rail use until 1975, when Vermont Railway removed the tracks for use elsewhere for emergency repairs. The major structures on the rail line, "Bishops Bridge" and the North Beach Highway Underpass, and all culverts and the railroad subgrade remain intact. Preseault, 24 Cl. Ct. at 822.
 
 
 170
 The Court of Federal Claims recognized that Vermont law requires more than nonuse of a railroad easement to extinguish it, and that some act by the owner of the dominant tenement beyond nonuse is required to establish abandonment. For the Court of Federal Claims, the removal of the tracks in 1975 was enough to hold, on the facts, that abandonment had occurred in 1975. Id. at 833. No other fact is cited by the court, or found in the record of the case, to sustain its conclusion.
 
 B.
 
 171
 During the pendency of the Preseaults' litigation in the Vermont state courts to declare that the easements had been abandoned by removal of the tracks, denominated as Trustees of the Diocese of Vermont v. State, and decided in 1985, the State legislature passed in 1982 a specific enactment which required the State to retain, for future transportation purposes and for any other purpose not inconsistent with such future transportation purposes, all railroad rights-of-way it owned over which active rail service had been, or would be, terminated. The 1982 Act was made retroactive to apply to the easements that ran over the Preseaults' property.
 
 
 172
 In considering whether the Preseaults presently enjoy fee simple absolute ownership in their property, the Court of Federal Claims did not assess the impact of the 1982 Act. For the reasons stated in this opinion, the Court of Federal Claims thus erred.
 
 C.
 
 173
 Vermont common law includes the "shifting public use" doctrine as part of its law concerning the abandonment of easements. See Brainard v. Missisquoi R.R. Co., 48 Vt. 107 (1874). In its broad outline, the shifting public use doctrine--judicially created as part of the common law--provides that the progression from the public use for which an easement is originally granted to another public use will not constitute an abandonment of the easement, so long as the new use is deemed permissible by the courts. Whether a new use is deemed permissible entails analysis of the scope and purpose of the original use, the relationship of the new use to the original use, and the public interest considerations in the relationship between the old and new uses. When a new use of an easement is judicially validated under the shifting public use doctrine, that use, by law, does not manifest "a purpose inconsistent with its future existence" under the law stated in the Lague case.
 
 
 174
 In considering the State's argument that the easement survived abandonment under the shifting public use doctrine, the Court of Federal Claims indicated favor with the proposition that the current use is not inconsistent with rail use, when seen as another public use, see id. at 834. Nevertheless, the court concluded that the hiatus in any use of the easement from 1975 to 1985 prevented employment of the shifting public use doctrine to validate the current uses of the easement on the Preseaults' land. In short, the "discontinuity" of public use left the abandoned easement in extinguishment, and the court found that:
 
 
 175
 the shifting public use doctrine is inapplicable to the facts of this case . . . . [It] cannot be used to justify some 10 years of non-use or to resurrect after 10 years an easement otherwise extinguished under Vermont law, nor can it be used to revoke a grantor's properly triggered reversionary interest.
 
 
 176
 Id. at 833.
 
 
 177
 Because the shifting public use doctrine is only relevant if the removal of tracks in 1975 did not extinguish the easement, I will focus on the 1975 issue and return later to the shifting public use doctrine as an alternative explanation of why the easements were not terminated in 1985.
 
 V.
 
 178
 We subject the decisions of the Court of Federal Claims on motions for summary judgment to de novo appellate review. Dehne v. United States, 970 F.2d 890, 892 (Fed. Cir. 1992). In this case, the Court of Federal Claims concluded that, on the undisputed fact of track removal in 1975, the Preseaults had proven abandonment on the facts, and extinguishment of the easements as a matter of law, at that time. We must decide if any error was made by the Court of Federal Claims in its assessment of the undisputed facts.[5]
 
 
 179
 After a thorough examination of Vermont law and an intensive inspection of the undisputed facts in this case, I conclude that the Court of Federal Claims erred in its determination that the easements ceased to exist in 1975. Because of this error, the Court of Federal Claims did not decide whether the easements were subsequently extinguished in 1985 by the conversion to their present uses. The 1985 question, like the 1975 question, raises an ultimate issue of law on which there are no disputed facts. I see no reason, therefore, to remand the case for an initial decision on this issue. I think we are free to decide ourselves if, under Vermont law, the easements were terminated in 1985.
 
 A. The Question of Abandonment in 1975
 
 180
 Reading the Vermont case law on abandonment in full, it is clear that the Court of Federal Claims erred by underestimating how difficult it is to abandon an easement in Vermont. Nonuse by the railroad for any purpose, alone, will not extinguish an easement, no matter how long the nonuse extends. Lague, Inc. v. Royea, 568 A.2d 357, 358 (Vt. 1989). Consequently, the hiatus of 10 years from 1975 to 1985, when allegedly no use was made of the easement by the State, is not evidence of a present intent to relinquish the easements. Even after years of complete nonuse and decay, the railroad could have resumed use, or continued further nonuse and decay, of the easements.[6] Had such conduct occurred, the Preseaults would be unable to prove abandonment. That easements are difficult to extinguish in Vermont is emphasized by the significant burden attending one who seeks to prove abandonment. The affirmative conduct of the railroad (as owner of the dominant tenement in the easement)--signalling abandonment--must be conclusive and unequivocal. Nelson v. Bacon, 32 A.2d 140, 146 (Vt. 1943). The signal of abandonment must manifest a present intent to relinquish the easement, or a purpose inconsistent with future existence of the easement. Lague, 568 A.2d at 359. Ambiguous signals, that is, signals capable of being understood in more than one way, will not suffice to show abandonment.[7]
 
 
 181
 The Court of Federal Claims' underestimation of the essential thrust of Vermont abandonment law seems to have been driven, in substantial part, by its overemphasis on the importance of removal of tracks to the question of whether the easements had been abandoned. Such overemphasis resulted from a misreading of Vermont case law.
 
 
 182
 The Court of Federal Claims erroneously cited Stacey v. Vermont Central Railroad Co., 27 Vt. 39 (1854), for the proposition that a railroad right-of-way is abandoned when "the line was rerouted and the original tracks were used on a new line." Preseault, 24 Cl. Ct. at 832. The court's reliance on Stacey as authority that removal of tracks proves abandonment is misplaced. The case involved a railroad that surveyed a right-of-way over the plaintiff's property, and took the steps to condemn the way thus surveyed. A commissioners' award of the damages due to plaintiff was entered, but the railroad did not pay. The defendants later "changed their line of road by locating the same on other land than that of the plaintiff, and upon which their road has been constructed." Stacey, 29 Vt. at 43. Because Vermont law does not vest a condemned right-of-way in the condemnor until payment is made for the way, the Supreme Court of Vermont held that the railroad never acquired a right-of-way over plaintiff's land. The "change in the line of their road, however, will operate as an abandonment of their former survey on the plaintiff's land, so that the company can no longer claim any right or interest in the land itself, or to any easement growing out of it, in consequence of that survey having been made." Id. (emphasis added). The opinion of the Vermont Supreme Court makes it clear that no easement was ever created in the premises, and that no track was ever laid over and then removed from the plaintiff's land. The only thing "abandoned" in the case was the original survey. Stacey did not involve the removal of tracks and is therefore irrelevant to the question of whether the easements in this case were abandoned by removal of tracks.
 
 
 183
 The Court of Federal Claims cited American Steel & Iron Co. v. Taft, 199 A. 261 (Vt. 1938) for the proposition that a "railroad that ceased to operate on right-of-way and that sold tracks and equipment to second railroad had abandoned right-of-way easement." Preseault, 24 Cl. Ct. at 832. Again, the court misunderstood the Vermont case, and reliance thereon is similarly misplaced. The State of Vermont, at some point in the past, owned the West River Railroad. Later, the State sold to the American Steel & Iron Company "the rails, rail accessories and ties on the greater part of the length of the railroad." American Steel, 199 A. at 262. The plaintiff sought:
 
 
 184
 to enjoin the defendants, separate owners of lands through which the railroad passes, from interfering with the removal of such rails, accessories, and ties. The bill alleges that some of the defendants have notified the plaintiff that they claim that the right of way and materials upon their lands belong to them, and that they have forbidden the plaintiff from entering upon the railroad rights of way to remove the rails and materials . . . . The bill also alleges that the State of Vermont has not abandoned the right-of-way or easements which it acquired from the West River Railroad Company and has never abandoned the rails and other chattels thereof.
 
 
 185
 Id. The defendants' demurrer to the bill was overruled by the chancellor and the bill was adjudged sufficient. On appeal, the ruling on the demurrer was challenged on the ground that "there is no equity in the complaint because the plaintiff has a full, adequate, and complete remedy at law." Id. The question on appeal was thus whether the plaintiff had a remedy in replevin or trover, and if so whether that remedy precluded the bill. The question was not whether the state had abandoned the right of way itself.
 
 
 186
 The opinion of the Supreme Court, after examination of precedent, concluded that the tracks, accessories, and ties had not become a part of the realty, but remained chattels, subject to recovery in replevin or trover. Notwithstanding the availability of the causes of action at common law, the court sustained the overruling for the demurrer because the remedy at law was impaired, in that case, by the need of the plaintiff to maintain five separate suits against the individual defendants, who had not acted in concert. In the course of its discussion of the remedy available at common law, the court noted that the tracks and equipment "do not become part of the realty and may be removed by the railroad company or its assigns on abandonment of the right of way or within a reasonable time thereafter." Id. Thus, the court did not hold that sale of the tracks to another party constitutes abandonment of the railroad right-of-way. Instead, nearly the converse is correct; the court held that abandonment of a right-of-way does not constitute abandonment of the tracks structures and other equipment on the right-of-way. By affirming the overruling of the demurrer, the Supreme Court did not dislodge the State's allegation that it had not abandoned the right-of-way or easements, and simply held that the plaintiff had the right to remove the rails, accessories and ties, regardless of the property law status of the right-of-way.[8]
 
 
 187
 In addition to the authority misconstrued by the Court of Federal Claims, one Vermont case mentioned but not fully discussed by the court stands out in particular on its facts, and is strongly, if not dispositively, instructive to the particular abandonment issue before us. The facts of the case thus warrant full explication. Stevens v. MacRae, 122 A. 892 (Vt. 1923), involved a dispute over access by the plaintiff to his homesite across the defendant's farm land. Plaintiff brought a bill in equity to restrain defendant from obstructing plaintiff's use of a right-of-way to his premises from a public road. The chancellor denied the bill. On appeal, the Supreme Court examined plaintiff's deed from defendant's predecessor-in-interest, which provided "a right of way to the above-described premises across other land of said grantors from the public highway passing the dwelling house of the grantors." Id. 122 A. at 892 (emphasis added). The Supreme Court held that under the deed "the grantee is entitled to a convenient, reasonable and accessible way." Id. at 894. Since the grant had not fixed the location of the right-of-way by specific metes and bounds, and the owners of the dominant and servient estates were unable to agree on the way's location, the Supreme Court remanded the case to the chancellor to determine the exact location of plaintiff's way. In doing so, the Supreme Court expressly held that a part of defendant's farm was excluded from the land available to the chancellor, on remand, for carving out plaintiff's right-of-way. Id. The excluded part is significantly pertinent to our inquiry.
 
 
 188
 Long before the conveyance to plaintiff, in or before 1852, the Rutland & Whitehall Railroad Company took a right-of-way 2,122 feet long and 66 feet wide across the farm. That right-of-way was assigned and transferred, the last assignment being in 1870 to the president and managers of the Delaware & Hudson Canal Company. According to the Supreme Court "[i]t further appeared that this railroad right of way, here called 'D. & H. way,' had not been used for railway tracks for at least 20 years at the time of the last hearing in this case, in October, 1919." Id. The map of the property included in the court's opinion clearly depicts each boundary of the railroad right-of-way, the location of the original tracks and the use to which the easement was being put at the time of the dispute over access to the plaintiff's property. In the center of the right-of-way is a line that is simultaneously labelled "D. & H. R.R. RIGHT OF WAY" and "OLD R.R. GRADE NOW USED FOR ROADWAY." Id. at 893. The map thus shows that the grade of the right-of-way was used for a road. Although the opinion does not state explicitly that the rails had been removed at some time, I think it fair to assume that rails were actually removed, or removed de facto by their burial, in order to allow use of the grade as a road.
 
 
 189
 The Supreme Court stated Vermont law: that the D. & H. way could not be deemed abandoned (and thus available for routing of the plaintiff's uncharted way) in the mere lapse of time up to the date of plaintiff's deed. Since no facts in the case pointed to abandonment by D. & H. of its way, the Court held that "[t]he mere lapse of time and nonuser for railway tracks for the length of time shown by the record, prior to the date of plaintiff's deed, did not in themselves operate in law as an abandonment of the possession." Id. at 894. The D. & H. way thus was reserved still to the railroad, and not available as "other lands of said grantor." Having so belabored the facts of Stevens v. MacRae,[9] suffice it to say that actual or de facto removal of tracks, coupled with the long period of non-rail use, and with present use by someone as a road, was not deemed enough to find the D. & H. way abandoned. All that is missing from Stevens v. MacRae, to make it an "all fours" precedent in favor of the State, is the substitution of "removal of" for "nonuser for" before "tracks" in the words just quoted from the court's opinion.
 
 
 190
 I thus conclude that Vermont precedent denies the fact of track removal dispositive force in determining if abandonment has occurred. At the least, the pertinent precedent does not hold that removal proves abandonment: the Vermont courts have not decided that removal of tracks must prove abandonment.[10] But even absent Stevens, the track removal in this case, in my view, does not provide the conclusive and unequivocal relinquishment signal required by Vermont law. The reason for which rails are removed is relevant,[11] and when a reason not necessarily consistent with abandonment is given, the reason must be carefully assessed. Here, the rails on the Preseaults' property were special, known as "105-pound Dudley Section," a comparatively rare type of rail used only on the New York Central System and lines, like the Rutland, that followed the New York Central engineering standards.
 
 
 191
 In preparation of the 1976 excursion season, trial inspections of the rails between Burlington and Rutland disclosed internal defects. The only readily available source of good quality "105-pound Dudley Section" rails was on the North Burlington line between mileposts 122.399 and 124.6875. The rails between mileposts approximately 123.9 and 124.053 were on the Preseaults' property. The State and the railroad amended their track rehabilitation agreement to allow the railroad to make use of the Dudley Section rails for emergency repairs. All the Dudley section rails on the Preseaults' property were removed, but the same kind of rails were left in place at milepost 123.342, quite near to the southern end of the Preseaults' property at approximately milepost 123.9. Within one mile of the Preseaults' property, the railroad continued active transportation service after 1975.
 
 
 192
 A full view of the 1975 facts shows removal of special tracks for less than a mile on the Preseaults' property for emergency repair purposes, with the same special track at one end of the Preseaults' property left in place, and with active rail service being continued over tracks lying within about a mile from the Preseaults' property.[12] The partial removal of the special track did not disturb the road bed and major improvements, which were left in place. In addition, the record shows that it would cost approximately $533,000 to resume active rail service over the Preseaults' property. The Court of Federal Claims did not analyze these additional facts in concluding that the track removal in 1975 necessarily proved abandonment of the easements. These circumstances of the track removal cannot be overlooked, however, and they raise serious question that any solid conclusive signal of permanent abandonment can be read into the bare fact that the tracks were removed.
 
 
 193
 The 1975 track removal also has to be considered in connection with certain pertinent uncontested facts also not considered by the Court of Federal Claims in its abandonment analysis. Certainly, these uncontested facts thoroughly blur any abandonment signal that might have been sent to the Preseaults by the removal of the tracks in 1975. In my view, these facts demonstrate conclusively that the State cannot be said, as a matter of law, to have extinguished the easements in 1975.
 
 
 194
 After partial removal of the tracks in 1975, and continuing through the present trail use, pre-existing license and crossing agreements in favor of the State and Vermont Railway have remained in effect. The State expressly retained its interest in those agreements in the State-City-Railroad trail contract. Since the 1950's the right-of-way has continually been the route of a major above-ground electric transmission line owned by the City of Burlington's municipal electric department. This public use of the easement is authorized by a succession of standard license agreements between the City, Rutland Railway, the State, and Vermont Railway. Pursuant to such license and crossing agreements, the existence of which is not contested by the Preseaults, the State and the railroad collect rents or license fees. Even Mr. Preseault, as late as February 5, 1991, paid such a fee for his crossing at milepost 124.025, albeit under protest as to the enforceability of the license. A dominant tenement owner who continues to enforce licenses to use or to cross an easement can hardly be considered to have signaled abandonment of his easement.
 
 
 195
 Such is all the more true in this case, because additional rights are asserted by the State and the railroad regarding the allegedly abandoned easements. Shortly after removal of the tracks, the City of Burlington installed a sixteen inch water main in the ground of the easements. This was done pursuant to a contract between the City and Vermont Railway entered into shortly before the tracks were removed, which granted the City a twenty foot right-of-way parallel to the road bed. Paragraph SIXTH of the contract relieved the railroad and the State of any liability should damage occur to the waterline "if the Railroad or the State Constructs [sic] tracks over all or a portion of the waterline." The City agreed to pay $1116 per year for right to use the railroad's right-of-way, and the contract expressly stated that the City obtained only a license thereby, not an estate or easement. The waterline contract, contemporaneous with the track removal, evidences the State's right and interest in reestablishing active rail service over the easements, and even assigns responsibility for future events occurring during such rail service. This is a quite forceful evidentiary signal of nonabandonment.
 
 
 196
 The Court of Federal Claims failed to examine and assess the uncontested facts concerning the track removal and the existence and enforcement of the license and crossing agreements. These overlooked and undisputed facts compel the conclusion, as a matter of law, that the State's intent to abandon the easement is at best equivocal or ambiguous, if not nonexistent. On these facts, Vermont as a matter of law has demonstrated that the removal of the tracks in 1975 does not spell extinguishment under Vermont law. Absent any other fact to prove abandonment, the Preseaults fail to meet their burden of proof to show that the State has conclusively and unequivocally manifested a present intent to relinquish the easements. Lague, Inc. v. Royea, 568 A.2d 357, 358 (Vt. 1989). The easements were not abandoned in 1975.
 
 
 197
 The plurality judges recognize that the record contains undisputed facts that are inconsistent with the trial court's determination that the easements were terminated in 1975 solely by removal of the tracks. Rather than give those undisputed facts their due under Vermont common law, as conclusive demonstration that no unequivocal signal of abandonment can be read into the track removal--and hence no abandonment in 1975--the plurality judges dismiss those facts as not "significantly" undercutting the trial court's conclusion.
 
 
 198
 The plurality judges find compelling evidence of abandonment in the fact that the State made no effort to resume rail service over the easements after 1975. Inactivity on the easements, however, is utterly irrelevant to the issue of abandonment in Vermont, where an easement "cannot be extinguished by nonuse alone, no matter how long it continues." Lague, 568 A.2d at 358.
 
 
 199
 The telling facts concerning the enforcement of crossing and license agreements both before and after removal of the tracks--which evidently cause concern for the plurality judges--are dismissed by them as incidents of either the "revenue collectors" failing to keep their records up to date, or of overreaching attempts to collect sums not due, or of persons, such as the Preseaults, more willing to pay rather than to fight. These explanations are pure speculations, at best. There is no support in the record for the inferences the plurality judges would draw from the admitted facts of the enforcement of the crossing and license agreements. The 1985 assertion to the Interstate Commerce Commission only stated the fact that no traffic had moved over the tracks for two years and that no one had complained about the lack of active rail service over the tracks. The 30-year lease with the City of Burlington, as I have explained, is a five year lease renewable six times, cancelable by the State virtually at will, and it expressly states that the State reserves its rights to resume active rail service over the easement. This particular signal of nonabandonment is no more self-serving than the pre-existing crossing and license agreements which the State has continued to enforce after 1975. Finally, I note that the plurality judges simply dismiss, without discussion or analysis, the other undisputed facts pointing to nonabandonment which I have discussed in detail above.
 
 
 200
 The historic facts about the waterline license, for example, could be restated as follows. The railroad, while in the process of removing the tracks, was approached by the City of Burlington, which asked if the railroad would grant it a license for the waterline. If the railroad, by removing the tracks, was trying to send the unequivocal signal of abandonment, it would have replied, "Can't you see, we are abandoning our easement by removing this track. If you want a license to use this land, go talk to the Preseaults, because they own the land in fee simple absolute now." Instead, the railroad seems to have said, "Go talk to our lawyers, for if we re-lay the tracks and damage occurs to your pipe, you will have the responsibility for repairs." Given this common sense explanation of the waterline license facts, I can understand why the plurality judges simply ignore the event: the urge to find a federal taking is simply overwhelming. The same explanation covers the willingness of the plurality judges to reach their goal, notwithstanding their tacit agreement with my criticism of the way the Court of Federal Claims read the pertinent Vermont case law.
 
 
 201
 Because the easements were not abandoned in 1975, they remained the property of the State, and the State remained free to make any lawful use of the easements that it saw fit. In 1982, the State legislature enacted a statute that specifically addressed the subject of abandoned railroad rights-of-way that the State owned. At the time of this enactment, the Preseaults were litigating a suit in the Vermont courts in which they sought a declaration that the easements had been terminated by the railroad's removal of tracks and equipment. See Trustees of the Diocese of Vermont v. State, 496 A.2d 151 (Vt. 1985). The terms of the 1982 statute relate directly to the issue at hand in this case:
 
 
 202
 Notwithstanding the provisions of section 213 of Title 1 [against retroactivity, generally], when railroad operations cease on railroad rights-of-way owned by the state or municipality the title or interest held by the state or municipality in such rights-of-way shall be retained by the state or municipality for future transportation purposes and such other purposes as are not inconsistent with future transportation purposes; except that such rights-of-way shall not be used by members of the general public without permission of the state or municipality. The state or municipality shall allow abutting farm operations to use the land over which the rights-of-way pass for agricultural purposes.
 
 
 203
 1982 Vt. Acts No. 187 (emphasis added).
 
 
 204
 The provisions of section 213 of Title 1, to which the 1982 Act refers, specify that "Acts of the general assembly . . . shall not affect a suit begun or pending at the time of their passage." Thus, the general rule in Vermont that new statutes do not affect pending cases was expressly made not applicable to the 1982 statute, which compels the State to retain the easements that run over the Preseaults' property. The Preseaults' suit to declare that the easements were abandoned in 1975 was pending when the 1982 statute was enacted. Consequently, the easements over the Preseaults' property are expressly subject to the 1982 Act.
 
 B. The Question of Abandonment in 1985
 
 205
 The present trail over the Preseaults' property was created in 1985. At that time, the easements were still alive in the hands of the State, both because state common law provides that nonuse of an easement does not cause it to be extinguished, Lague, 568 A.2d at 358, and because the state legislature in 1982 required the State to retain the easements for future transportation uses and any other uses not inconsistent with such future transportation uses.
 
 
 206
 The remaining question before this court is whether the creation of the trail extinguished the easements, under Vermont law, and, thus, left the Preseaults in fee simple absolute possession of their property.
 
 
 207
 There are two answers to this question, one legislative and found in the 1982 Act, and the other judicial and found in the common law of Vermont. Because the legislative answer is simpler to explain, I will turn to it first.
 
 The Legislative Answer
 
 208
 The text of the 1982 Act, set forth above, makes it certain that the State was compelled to retain the easements over the Preseaults' property. The retroactive feature of the Act, making its terms specifically applicable to the easements in this case, can be read to mean that even the acts of the railroad in 1975 cannot be deemed acts of abandonment. We need not rely on such retroactive application of the statute, however, because it clearly applies to the easements in question, and declares the State's duty to retain them after 1982. Thus, we need only to determine if the walking and bicycle trail is either a transportation use, or another use not inconsistent with future transportation uses.
 
 
 209
 I think it is unarguable that the current uses of the easements are within the uses specified in the 1982 Act. Use of the easements for the trail while holding them for future transportation uses, as the contract creating the trail expressly provides, satisfies the 1982 Act. Consequently, I must conclude that, pursuant to the 1982 Act, the easements survive in their current uses. As a matter of state legislation, the Preseaults have no present property interest on which to pitch a federal takings claim.
 
 
 210
 With regard to this legislative answer, one may fairly ask what we are to make of the state litigation in which the Preseaults sought a declaration that their easements had been terminated by the track removal. In that case, the Vermont Supreme Court concluded that it lacked jurisdiction to give the Preseaults the answer they sought, because federal law governs whether a railroad may abandon a railroad right-of-way. Federal law, however, does not preempt the issue of whether the state legislature can enact a measure which denies the State the power to abandon a railroad right-of-way that it owns. The Vermont Supreme Court had no occasion to measure the impact of the 1982 Act when it decided Trustees of the Diocese of Vermont v. State in 1985, because the case did not involve an assertion by the State that the easements were preserved by the 1982 Act. The State's argument in that case was that railroad rights-of-way could not be abandoned without the consent of the federal government, a proposition seemingly uncontestable at the time. The short of the matter is that the Trustees of the Diocese of Vermont case has no bearing on the issue now before this court, and is harmonious with the conclusion that the state legislature preserved the easements in 1982 for their current uses.
 
 
 211
 In sum, the legislative answer requires us to make no predictions about how a Vermont court would rule today. The terms of the statute are unmistakenly clear, and the conclusion reached from them is unescapable.
 
 The Common Law Answer
 
 212
 The common law answer is more complicated, because it requires us first to assess the scope of the shifting use doctrine in Vermont's law of property, and then to apply that doctrine to the undisputed facts of this case. In the end, the common law answer requires us to make a prediction as to how the Vermont Supreme Court today would apply its shifting use doctrine to this case. Our task in this regard is not to vote our individual consciences or preferences, but instead to make the most we can of extant Vermont law and to follow whatever direction we can derive from Vermont's judicial precedents.
 
 Vermont's Shifting Public Use Doctrine
 
 213
 As the Court of Federal Claims noted, the shifting public use doctrine is longstanding and recognized by leading railroad law scholars, including Edward L. Pierce and Chief Justice I.F. Redfield (of Vermont). See Preseault, 22 Ct. Cl at 832-33 (citing Edward L. Pierce, Treatise on the Law of Railroads 233-34 (1881) and I.F. Redfield, The Law of Railways 269 (6th ed. 1888)).[13]
 
 
 214
 Chief Justice Redfield's treatise--particularly the 1888 edition that is close in time to RCRC's 1899 condemnation of the Barker Estate easement--elaborates upon the shifting public use doctrine. Discussing the question whether the owner of the fee underlying a street or canal must be compensated when a railroad is constructed over the street or canal, the treatise explains that
 
 
 215
 The mere possibility of reverter to the original owner, or his heirs or grantees, is not regarded . . . as any appreciable interest requiring to be compensated. . . . . The most the owner of the fee could claim in such case is to recover compensation for any additional land taken, and for any additional burden imposed upon the land appropriated [above and beyond that imposed by the original highway use], as well as for any additional damage to the adjoining lands of the same owner.
 
 
 216
 I.F. Redfield, The Law of Railways 269 (6th ed. 1888).
 
 
 217
 Edward L. Pierce's treatise contains a more lengthy discussion of the principle:
 
 
 218
 The property [taken for the purposes of a railroad] is . . . to be deemed taken for a public use itself, rather than for the peculiar use and enjoyment of the party to whose position it passes. It does not therefore revert to the owner upon a mere transfer of the railroad to another company, nor upon its appropriation to another similar public use.
 
 
 219
 Edward L. Pierce, Treatise on the Law of Railroads 158 (1881) (emphasis added). Pierce goes on to explain that
 
 
 220
 [w]hen property has been taken for a public use, and full compensation made for the fee or a perpetual easement, its subsequent appropriation to another public use-- certainly if one of like kind--does not require further compensation to the owner. . . . There is no change of use involving a new taking when, under legislative authority, the location of a plank-road or canal is converted into that of a highway, or a railroad.
 
 
 221
 Id. at 233 (citing Brainard v. Missisquoi R.R. Co., 48 Vt. 107 (1874)).
 
 
 222
 The proposition in Vermont law that railway use of an easement is a public use thus is hardly exceptional. With specific reference to the condemnation of private lands to create easements for rail use, the Supreme Court of Vermont quite early on held "that a rail road is an improved highway, and that property, taken for its use by authority of the legislature, is property taken for the public use, as much as if taken for any other highway. . . ." White River Turnpike Co. v. Vermont Central Rail Road Co., 21 Vt. 590, 594 (1849). White River is not an isolated example of the Vermont Supreme Court characterizing the railroad corridor as a public highway burdened with a public trust. A similar view was expressed when the court upheld the constitutionality of a statute protecting rail corridors from adverse possession: "The exception is not a grant of a privilege to a private corporation, but an exception of land set apart for a public use. . . ." Drouin v. Boston & M.R. Co., 52 A. 957, 959-60 (Vt. 1902) (citations omitted). In the same vein, a few years later the court stated in Osgood v. Central Vermont R. Co., 60 A. 137 (Vt. 1905), that:
 
 
 223
 A railroad corporation holds its station, grounds, railroad tracks, and right of way for the public use for which it is incorporated, yet as its private property, and to be occupied by itself or by others in the manner that it may consider best fitted to promote or not to interfere with the public use.
 
 
 224
 Id. at 140.
 
 
 225
 Early Vermont Supreme Court cases recognize and enforce the shifting public use doctrine. In West v. Bancroft, 32 Vt. 367 (1859), which may be the first of such cases, a municipality maintained a public highway on an easement across the plaintiff's property. The municipality built a reservoir, or cistern, on the easement, to conserve and use water for public purposes, including the sprinkling of streets. The owner of the reversionary right in the land under the highway brought suit in trespass. The jury returned a verdict of not guilty for the defendant. On appeal, the Supreme Court, per Pierpoint, J., after approving the jury charge, stated that the "only remaining question is as to the right for the public to put a reservoir, or cistern, into the earth, within the limits of the highway, for the purpose of retaining water. . . ." Id. at 370. In language fairly described as expansive, the court answered its question, at length:
 
 
 226
 The power of the public over highways is not confined to their use for the sole purpose of travel. Many things may be done therein for the promotion of the public convenience and health, such as laying water pipes, constructing drains and sewers, making reservoirs, and many other acts which the public may require; and when these acts are done by the public authorities in a judicious manner and with proper care, having reference to the rights of adjoining proprietors, and the owners of the fee of the land, if such proprietors are incidentally affected injuriously thereby, or the owner of the fee sustains a technical damage, the law furnishes no remedy therefor.
 
 
 227
 But in this case it is not necessary to resort to this principle, even to justify the acts of the defendant. It is conceded that this reservoir was built by the defendant as a public officer, having charge of such matters, and in the discharge of his official duty; that the object was to retain water to be used in sprinkling the streets, and for other public purposes. This, we think, clearly comes within the object and purpose for which the highway was originally laid out.
 
 
 228
 All those acts which tend to facilitate travel, and add to the ease, comfort and convenience of the traveler, or his beasts, whether it be by cutting down the hills, filling the ravines, paving the roads, erecting watering troughs, or sprinkling the streets, are acts which it is proper and often necessary for the public to do.
 
 
 229
 Id. at 371.
 
 
 230
 A few years later, the Supreme Court of Vermont revisited the public use doctrine in Brainard v. Missisquoi R.R. Co., 48 Vt. 107 (1874). In that case, a railroad was the successor-in-interest to a plank road company, which had built and maintained a public plank road on an easement over the plaintiff's property. When the railroad removed the plank road and replaced it with an operating railroad over the easement, the plaintiff sought compensation for the railroad's actions. The plaintiff contended that upon removal of the plank road, the easement originally created for the plank road was annihilated.[14] The plaintiff's case thus rested on the alleged abandonment of the plank road easement, and the creation on his land of a new rail easement for which he, as the fee owner, was owed compensation. The railroad countered that the "easement was not destroyed . . . . The public still have the benefit of its use. It has never ceased or been destroyed. It was only changed in the manner of its use by the public." Id. at 110. The court summarily rejected the plaintiff's theory, holding that the removal of the plank road had not abandoned the easement and that the railroad could maintain the different public use without compensation to the plaintiff landowner. Id. at 113-15.
 
 
 231
 While West and Brainard remain as the principal statements by the Supreme Court of Vermont of its doctrine of shifting public use, other Vermont cases and authority recognize the doctrine's viability. See Connecticut & Passumpsic Rivers Railroad Co. v. Holton, 32 Vt. 43, 47 (1859) (railroad "may do any act upon the land conducive to those public uses for which their charter was granted. . . ."); Rutland R. Co. v. Chaffee, 42 A. 984, 986 (Vt. 1899) (land leased by railroad remains in railroad's constructive possession); Cobb v. Western Union Tel. Co., 98 A. 758, 760 (Vt. 1916) (permitting joint use of railroad right-of-way by railroad and telegraph company); 1937-38 Biennial Report of the Vermont Attorney General 272, 273 (July 28, 1937) (state may locate its highway over former railroad right-of-way without payment of compensation); City of Montpelier v. Bennett, 125 A.2d 779, 785 (Vt. 1956) (highway use continues when section of highway bypassed for through traffic is kept open for parking and off-highway use) (dictum).[15]
 
 
 232
 I am thus confident that Vermont embraces the shifting public use doctrine, and that the Supreme Court of Vermont has consistently afforded the doctrine a generous reach in order to determine if a use for an easement not originally contemplated can proceed lawfully as a matter of state property law.
 
 
 233
 Application of the Shifting Public Use Doctrine to this Case
 
 
 234
 In 1985, the State, as owner of the Vermont Railway, Inc., and thus of the easements, put the easements to dual uses: railbanking and, pending the railbanking, a public walking and bicycle trail. The Court of Federal Claims did not decide if either or both of these two uses terminated the easements under Vermont law because it had concluded, erroneously, that the easements had been terminated in 1975. We must, then, consider the state common law implications of the 1985 uses.
 
 
 235
 By 1985, the concept of railbanking was firmly established in Vermont. Indeed, in 1963, in the statute pursuant to which the State acquired Vermont Railway, Inc., the concept was seeded by the provision that authorized use of the easements for "the continued operation of a railroad, or other public purpose. . . ." 1963 Vt. Acts No. 162, Section(s) 4. In 1982, the concept received full legislative dress in 1982 Vt. Acts No. 187, Section(s) 1, which declared that state-owned unused rail corridors must be retained for future transportation purposes. This statute, discussed at length above as the keystone to the legislative answer, thus plays an important role in the common law answer, as well.
 
 
 236
 When the State, railroad and City of Burlington entered their contract in 1985, the State's paramount interest was in preserving the rail corridor over the Preseaults' land for future rail use. The contract on its face reflects that interest, in that the State reserved its right to regain possession of the easement to use it for rail purposes, and the City became obligated to do nothing that would interfere with achievement of that goal. The City, on the other hand, no doubt had a lesser interest in maintenance of the rail corridor for future rail use. For it, the immediate interest at hand was to provide a recreational trail for public use.
 
 
 237
 The Preseaults argue that the original easements were granted for railroad purposes only, and that "railroad purposes" means the active running of trains over the easements, even though they recognize that Vermont law treats rail easements as a form of public highway. In connection with this argument, they vigorously contend that railbanking is not a railroad use. With respect to the trail use of the easements, the Preseaults argue that recreational trail use is so far removed from the rail use that the new use should be deemed inconsistent with and beyond the scope of the original easements. As for the railbanking and trail uses, the Preseaults contend, as did the plaintiffs in the landmark Brainard case, that the rights of the State in the original easements have been "annihilated".
 
 
 238
 In this case, neither the warranty deed from the Manwell's nor the commissioners' award of title to the railroad (after its condemnation of the Barker Estate property) expressly limit the use of the easements by the railroad to the running of trains over the easements, or suggest any term for the easement other than perpetuity for authorized use. The Manwell Deed contains no reference at all to any particular use for the easement thereby granted; it simply conveys the interest to the railroad for its "proper use, benefit and behoof forever." The first "whereas" clause of the commissioners' award recites that the condemnor "for the purposes of its railroad has located, entered upon and occupied lands owned by Charles C. Barker, Administrator of the Estate of William H.M. Barker." To be sure, the original easements were by their terms to be used for proper purposes by their owner. At that time, we may assume that only active railroad use was contemplated for the easements. Vermont case law teaches us that railroads may change their minds about uses for easements, either by failing to pay for the interest, see Stacey v. Vermont Central Railroad Co., 27 Vt. 39 (1854), or by converting the right of way to a roadway, see Stevens v. MacRae, 122 A. 892 (Vt. 1923). The plain meaning of the title documents, however, does not dedicate the easements solely to the running of trains, or specify that the easements will terminate if not used for running trains. This is important, because common law cases recognize that carefully restricted uses of easements can dictate conclusions as to abandonment. See, e.g., Minnkota Power Co-op., Inc. v. Lake Shure Properties, 295 N.W.2d 122, 127 (N.D. 1980) ("At the time the easements were granted the Landowners could have made reservations regarding the capacity of the line or its voltage. No such reservations were made."); Knox v. Pioneer Natural Gas Co., 321 S.W.2d 596, 601 (Tex. Civ. App. 1959) (noting that servient owner failed to restrict use of pipeline easement). Common law cases also recognize, equally importantly, that, when interpreting the scope of an easement it "will be inferred, in the absence of express language to the contrary, that the grantee is not restricted to the methods of use which were current at the time of the grant." Lawson v. State, 730 P.2d 1308, 1312 (Wash. 1986) (citing cases).
 
 
 239
 That the original easements in this case were not solely for the purposes of running trains over them is confirmed by meshing the terms of the property grants with the powers enjoyed by the original railroad at the time the easements were created. The easements, I have noted, were for "purposes of its railroad" (Barker), and for the railroad's "proper use, benefit and behoof forever") (Manwell). The acquiring railroad's charter did not limit its business to the running of trains, or even to the railroad business. Instead, the state legislature gave the acquiring railroad all the "powers, rights, privileges and franchises" enjoyed by railroads and other corporations in the state. Consequently, the original easements could by their explicit terms be used for any purpose legitimately undertaken by the railroad.
 
 
 240
 The documents which created the easements in suit thus do not limit use of the easements to the running of trains, as the Preseaults argue. The correct reading of the documents results in limiting the scope of the easements, at their narrowest, to whatever proper use a railroad would make of them.
 
 
 241
 The plurality judges do not dispute that the terms of the easements themselves, that is, the language in the Manwell Deed and in the commissioner's award, fail to specify any particular use to which the easements must be put.[16] They correctly recognize that determination of the proper scope of the easements is aided by reference to the corporate powers given to the railroad in its legislative charter. The plurality judges, however, read the legislative charter to specify only the powers given by "general law to railroad companies." As I have noted, the grant of corporate powers to the railroad is much broader, and includes all powers enjoyed by other, nonrailroad corporations in the state. This broad scope of authority informs the scope of the easements. Even at the time of the easements' creation, history teaches that railroads were in the process of building hotels along and near their lines, and, as early as the 1930's, the Union Pacific Railroad used its powers to create the Sun Valley ski resort as a recreational facility. Although no legislative history survives to prove that the Vermont legislature had such nonrail activities in mind for the Rutland-Canadian Railroad, it is certain that the legislative charter is broad enough to permit such activity by that railroad. But we need not rely on such broader powers of railroads, or the lack of limitation to rail uses in the conveyances, because the statutorily mandated rail banking is a rail use, and the trail use is fully authorized by state statute.
 
 
 242
 As I noted above, the primary interest of the State and the Vermont Railway, Inc., is to preserve the easements for future rail use. The contract with the City of Burlington, which lets it use the easements as a bicycle and walking trail, produces only a small income to the State, and the State and Vermont Railway have carefully reserved the right to terminate the contract quickly should the easements be withdrawn from the railbank for active use. The railbanking use of the easements is of a like kind to the easements being left in nonuse, an event that would not extinguish an easement in Vermont. Actually, railbanking is different in that nonuse connotes no purpose for the idleness of the right-of-way, whereas railbanking carries with it the expectation of future active rail use. Thus, the Preseaults' argument that railbanking is not a rail use must fail: whether viewed as an active rail use of a railroad easement for railbanking purposes, or simply as nonuse of an easement, under Vermont law such facts cannot extinguish these easements. Validation of the railbanking use of the easements requires no resort to the shifting public use doctrine, since the current use is within any "railroad purpose" scope of the original easements, and would be preserved during unlimited times of nonuse.
 
 
 243
 The question remains, however, whether the secondary use to which the easements have been put--the public walking and bicycle trail--is permissible under state common law. In this instance, the shifting public use doctrine is useful, once the nature of the new use is appreciated.
 
 
 244
 The bicycle and walking trail is admittedly a form of public highway, because it permits travel by the public along the trail. Walking, bicycling, and railroading represent different means of transportation, and to be sure, most of the use of the trail is no doubt for recreational purposes, whereas one might expect a lesser volume of recreational use of an active rail line.
 
 
 245
 Use of the easements for the present trail does not burden the servient tenements more than their use by the railroad for active commercial freight transportation, or for storage of idle rolling stock. The plurality judges' arguments to the contrary are unconvincing.[17] They seem to view active rail service as governed by tight time-tables which would warn the owner of the servient estate of the "occasional" times when he may be disturbed by the use of the easements. No facts in the record support such assertions, or permit any inferences therefrom. Indeed, judicial notice would include knowledge that freight trains run intermittently at night, causing severe vibrations and ensuing damage to structures located as close to the right-of-way as the buildings on the Preseaults' property. Similarly, we could not close our eyes to the burdens associated with empty rail yards: they are collection points for vagrants and pests, hardly the environment one would choose for one's backyard.[18] Such are the very conditions to which the Preseaults were lawfully exposed when the easements were used for railroad purposes. In addition, I cannot agree with the plurality judges' suggestion that the Preseaults are in greater threat of personal physical danger when bicycles, instead of railroad trains, cross their property.
 
 
 246
 The key point, however, is that both the trail use and the rail use involve a public way. Vermont courts have long viewed a railroad as an improved highway, see, e.g., Armington v. Town of Barnet, 15 Vt. 745, 750 (1843) (Redfield, J.), and I think the Supreme Court of Vermont would allow a railroad to convert an unused rail easement to other forms of transportation, even were the easement not simultaneously being used for an unquestionably valid rail purpose, as is the case here.
 
 
 247
 I reach my conclusion comfortably in the light of the expansive shifting public use doctrine in Vermont. In the celebrated Brainard case, the Vermont Supreme Court found the shift from a plank road to a railroad authorized under the plank road easement, without even a word of caution or concern that a fundamental shift of use had occurred. Instead, the court focussed on the question of whether--beyond the shifted use--the new use imposed a greater burden on the servient estate so as to warrant additional compensation for the new use. In that case, the court held that the landowner's property was not subject to greater burdens by the new use. That particular focus is not present in this case, because the Preseaults do not seek additional compensation for a greater burden on their tenement. They instead claim that the dominant tenement has been abandoned, and that they are thus entitled to full occupation of their land.
 
 
 248
 To counter the thrust of Brainard and Vermont's shifting public use doctrine generally, the Preseaults argue that a highway easement (such as that for a plank road) insofar as it is a general purpose public transportation easement can be converted to railroad use, without destruction of the highway easement, but that an easement for railroad purposes is limited to railroad use only and cannot be assigned a public transportation use as a walking and bicycle trail.[19] As support for that proposition, the Preseaults cite Lawson v. State, 730 P.2d 1308 (Wash. 1986), in which the Washington Supreme Court held that a rail easement was extinguished by use as a hiking and bicycle trail. In Lawson, the Supreme Court of Washington, over a dissenting opinion by Justice Utter, applied a narrow view of the shifting public use doctrine in holding that conversion from a "public transportation system to a recreational system" extinguishes the pre-existing rail easement. The court seems to have compared rail use by a private corporation, for commercial gain, to what it saw as recreational use.[20] Although Lawson is distinguishable on its facts from this case,[21] it does support the Preseaults' challenge to the trail use if the shift to primarily recreational use is determinative, the issue which Justice Utter neatly framed:
 
 
 249
 As "a public highway, created for public purposes" . . . railroads have been used to haul freight and transport travellers bent on business or social purposes. Those purposes were often realized in the course of transit, as well as after passengers debarked. The meeting in the club car, the vacation spent sightseeing from a Domeliner, as well as local tourist and commuter trains evidence the diversity of legitimate "transportation purposes." . . . .
 
 
 250
 My point in this comparison is to underscore the insignificance of the difference in transportation media. Just as with a railroad line, the maintenance of a trail is to furnish transportation. In broad terms, the variety of purposes individuals may have for seeking transportation remains relatively constant regardless of the medium chosen. While the mix of purposes may change in time, that is consistent with the evolution of society and the related use of the easement itself.
 
 
 251
 Id. 730 P.2d at 1320 (Utter, J., dissenting).
 
 
 252
 I do not think the decision in Lawson would be followed by the Supreme Court of Vermont to find the trail use of the easements required their extinguishment. Rather, because of its own longstanding and broad shifting public use doctrine, I think that it would look away from Lawson and instead to Washington Wildlife Preservation, Inc., v. State, 329 N.W.2d 543 (Minn.), cert. denied, 463 U.S. 1209 (1983).
 
 
 253
 The plurality judges' emphasis on Lawson as the leading decision on this topic, and their characterization of Washington Wildlife as "of little persuasive authority," is incorrect, as is their contention that "most" state courts which have adjudicated shifting uses have found the easements terminated by their shifted uses. By my count, there are five state cases holding the shift in use does not terminate the easements, and three cases that exist to support the plurality judges' "most" claim. Compare, Washington Wildlife Preservation, Inc. v. State, supra; Barney v. Burlington Northern RR Co., 490 N.W.2d 726 (S.D. 1992); Reiger v. Penn Central Corp., 1985 WL 7919 (Ohio App. May 21, 1985); Bernards v. Link, 248 P.2d 341 (Or. 1952); and Faus v. City of Los Angeles, 431 P.2d 849 (Cal. 1967), all permitting new use of easements, with Schnabel v. County of DuPage, 438 N.E.2d 671 (Ill. App. 1981); Polinow v. Wisconsin, 276 N.W.2d 738 (Wis. 1979); and Lawson v. State, supra, all precluding new use of easement. Thus, one should not elevate Lawson, as the plurality judges do, while denigrating Washington Wildlife. The only reasonable conclusion to be drawn from these cases is that the state courts facing the question we must decide have split about evenly, and that the only responsible course for us is to determine which of the two admittedly leading cases--Washington Wildlife and Lawson--the Supreme Court of Vermont would most likely follow.[22]
 
 
 254
 The court in Washington Wildlife cited and relied on Minnesota's traditional generous view of the shifting public use doctrine: "the mode of exercising [the public] easement is expansive, developing and growing as civilization advances." Id. at 546. In language that sounds much like an echo of the Vermont Supreme Court's 1859 decision in West v. Bancroft, the court noted that "[i]t has long been held that the holder of an easement is not limited to the particular method of use in vogue when the easement was acquired, and that other methods of use in aid of the general purpose for which the easement was acquired are permissible." Id. Quoting from an 1895 case that it had approved in 1981, the Minnesota Supreme Court said that "it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed." Id. at 547. The court also noted that the trail would be used for transportation, albeit recreational transportation:
 
 
 255
 The right-of-way in this case will be used by hikers, bikers, cross-country skiers and horseback riders. The right-of-way is still being used as a railroad right-of-way for transportation even though abandoned as a railroad right-of-way. Recreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates. The use is a public use, which is consistent with the purpose for which the easement was originally acquired. State and federal statutes encouraging the conversion of railroad rights-of-way to recreation trails also support our holding.
 
 
 256
 Id.
 
 
 257
 The issue of trail use of the easement is unique in this court. Here, the State owns a railroad for which it has reserved the right to resume active service over the easements which the state legislature has expressly preserved. In the meantime, the State is obligated to use the easement for future rail line inventory, and is authorized to allow interim use as a bicycle and walking trail. The State has not manifested "either a present intent to relinquish the easement or a purpose inconsistent with its future existence." Nelson v. Bacon, 32 A.2d 140, 146 (Vt. 1943). Under my interpretation of the easement in question under the law of Vermont, for the reasons set forth above, the State's easements are not extinguished because of their current uses. At the present time, the State continues to enjoy ownership of the dominant tenements in the easements that cross the Preseaults' property. This is so as a matter of state statute and, alternatively, state common law on easements.
 
 VI.
 
 258
 As a final explanatory matter, I should note that the role of the United States in the creation of the trail does not override the state action which perpetuated the easements. It is true that easements cannot be abandoned without the consent of the federal government. Thus, Vermont alone could not have deemed the easements terminated in order to use them for the trail. Instead, Vermont sought to keep the easements alive, to prevent their abandonment, in pursuit of state policies which mirror the federal policy in favor of perpetuating old rail easements. This is not a case in which the federal government is actively involved, by way of selecting a particular easement for preservation, or by imposing a federal system of land use regulation on a state that has no railbanking system of its own. Whether such federal involvement in another case would give rise to federal liability under the Fifth Amendment is not a matter upon which we should speculate or comment. Nor is this a case such as Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991), in which we held the United States liable for a taking of property as a result of its cooperative work with a state environmental agency which entered upon and occupied the Hendler's fee simple absolute property. In Hendler, no governmental agency had any property right in the premises, owned wholly by the Hendlers, upon which the defendants drilled wells. There was a clear occupation by the government of privately owned property. In this case, the property which is now occupied by the trail is owned by the State. The State can make any lawful use of the property that it wishes. The current uses are lawful. The Preseaults have no right to preclude the State from its occupation of the easements. That the United States has consented to the lawful occupation by the State of its own property does not bring this case under the holding in Hendler.
 
 
 259
 Suffice it to say that this particular case is limited to its facts, and to the impact of Vermont law as I read it.
 
 VII.
 
 260
 Since I have concluded that the State has not abandoned its easements, the Preseaults can only show ownership of the servient tenements. No argument has been made that the current use of the easements imposes a greater burden on the servient tenement than would be imposed were the State to use the easements for railroad purposes. Also, no other argument has been made that would afford the Preseaults standing to maintain their takings complaint in the Court of Federal Claims at this time. Consequently, the decision granting the Preseaults' partial summary judgment motion against the State should be reversed and the case remanded to the Court of Federal Claims, with the instructions to grant the cross motion for summary judgment of the State and dismiss the Preseaults' complaint for failure to state a claim upon which relief can be granted. The second decision by the Court of Federal Claims granting summary judgment for the United States should be vacated as moot.
 
 
 261
 For these reasons, I respectfully dissent from the court's holding, without a majority supporting opinion, that the Preseaults are entitled to compensation from the United States.
 
 
 
 *
 Chief Judge Archer and Circuit Judge Bryson did not participate in the disposition of this appeal
 1 U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation").
 
 
 [2]
 The Rails-to-Trails Act was enacted on March 28, 1983, as part of the National Trails System Act Amendments of 1983. Pub. L. No. 98-11, Title II, 97 Stat. 42, 48 (codified at 16 U.S.C. ( 1247(d) (1994)). The amendments are part of the National Trails System Act, which was first enacted on October 2, 1968. Pub. L. No. 90-543, 82 Stat. 919 (codified as amended at 16 U.S.C. (( 1241-51 (1994))
 
 
 [3]
 The plaintiff-appellants are the Preseaults individually and as partners of 985 Associates, Ltd., a Vermont limited partnership, and 985 Associates, Ltd. There were various transfers of the property interests involved during the time the Preseaults had an interest in them, but ultimately the Preseaults became the only real parties in interest. For purposes of this appeal we refer to the plaintiffs collectively as the "Preseaults."
 
 
 [4]
 The court had the benefit of amici curiae briefs from the Rails-To-Trails Conservancy, the National Trust for Historic Preservation, and the American Planning Association; M.L. and D.J. Glosemeyer/ Mountain States Legal Foundation; the National Audubon Society; as well as extensive briefing by plaintiffs-appellants, the Preseaults, defendant-appellee the United States, and defendant/cross-appellant, the State of Vermont
 
 
 [5]
 We shall follow the convention of numbering in chronological order the various federal court opinions sharing the Preseault name, the appellate court cases with Roman numerals, the trial court cases with Arabic numerals
 
 
 [6]
 It is unclear why, pursuant to a motion for summary judgment, judgment of dismissal of the complaint was ordered, rather than simply judgment for the Government, but we treat the judgment as one on the merits in favor of the defendant United States
 
 
 [7]
 A similar map appears in 24 Cl. Ct. at 820, although the later version is believed to be a more accurate representation of the situation. See 27 Fed. Cl. at 71 n.3
 
 
 [8]
 At common law, only the estate in fee simple, the estate tail (earlier, the estate in fee simple conditional), and the estate for life were deemed freehold estates, created by feoffment with livery of seisin
 
 
 [9]
 See, e.g., 7 Thompson On Real Property Section(s) 60.02(c), (d) (David A. Thomas ed., 1994)
 
 
 [10]
 Accord Bernards v. Link, 199 Or. 579, 248 P.2d 341 (1952) (holding that a deed purporting to convey a strip of land for use as a railroad right-of-way conveyed an easement, not a fee)
 
 
 [11]
 Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.")
 
 
 [12]
 The argument was renewed before the in banc court in one of the amicus briefs, submitted on behalf of the Government's position. See Supplemental Brief of Amicus Curiae National Audubon Society
 
 
 [13]
 The State further argues that certain state statutes, enacted in 1963 and 1982, "superseded any reasonable expectation that devolution of the right-of-way under Vermont law would be governed solely by common law principles." (The 1963 Act dealt with appropriations for acquisition of certain rights-of-way; the 1982 Act contained language to the effect that, when railroad operations cease on railroad rights-of-way owned by the State, the state is authorized to retain title to its right-of-way for future general transportation purposes.) This argument again confuses the "reasonable expectation" analysis of regulatory takings law with the question of the property interests of the parties. Since those interests were fixed at the time of their creation, the later statutes if applied to divest those interests would constitute a separate ground for finding a governmental taking. Accord Lawson v. State, 730 P.2d 1308 (Wash. 1986) (in banc), holding similar state statute unconstitutional as applied to fee estate holders
 
 
 [14]
 In Preseault 1, 24 Cl. Ct. 818, 832-33, the trial court noted two railroad treatises for their discussion of the scope of railroad easements: Edward L. Pierce, A Treatise on the Law of Railroads (1881); and Isaac F. Redfield, The Law of Railways (6th ed. 1888). Neither of these treatises keys specifically to Vermont law, and neither uses the term "shifting public use," or indicates if the doctrine is any more broad than the holding in the Brainard case, discussed infra
 
 
 [15]
 See also West v. Bancroft, 32 Vt. 367 (1859) (public highway easement held to permit public use of the easement for water supply services)
 
 
 [16]
 Cf. In re Mattison, 120 Vt. 459, 144 A.2d 778 (1958) (holding that selectmen of a town did not have legal authority to convert a public roadway into a hiking trail). But see Whitcomb v. Town of Springfield, 123 Vt. 395, 189 A.2d 550 (1963)
 
 
 [17]
 See, 3 J. Sackman, Nichols on Eminent Domain Section(s) 9.35, at 9-113 (3d rev. ed. 1985)
 
 
 [18]
 In Lague, the Vermont Supreme Court remanded the question of whether there had been an abandonment of two rights-of-way for ingress and egress to the trial court for application of the correct factual standard as enunciated in Nelson. 152 Vt. at 503, 568 A.2d at 359
 
 
 [19]
 [P]roperty owners adversely affected by regulation may choose not to resist regulatory restrictions in court. This will occur quite often whenever the cost of such a challenge exceeds the benefits of using the property freely. . . . The cumulative effect of individual decisions by property owners not to resist overregulation will be a suboptimal supply of the external benefits associated with the exercise of property rights
 Jan G. Laitos, Causation and the Unconstitutional Conditions Doctrine, 72 Denv. U. L. Rev. 893, 901 (1995).
 
 
 [20]
 Since the 1950s, Rutland Railway and later the Vermont Railway have licensed the Burlington Electric Light Department, a municipal utility, to install and maintain electrical transmission and distribution lines within the right-of-way. The City of Burlington installed a water line on the property under an agreement with the Vermont Railway. The Government says this occurred in 1974, but the Preseaults say it was in 1976
 
 
 [21]
 ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ("ICCTA"). The ICCTA recodified the ICC's responsibilities concerning abandonments and discontinuances and transferred those responsibilities to the newly created Surface Transportation Board, with a savings clause for suits initiated before December 29, 1995. See ICCTA Section(s) 102(a), 204(c)(2), 109 Stat. 822-29, 942. Because all events relevant here preceded the enactment of the ICCTA, this opinion refers to the ICC and to the pre-1995 version of its discontinuance and abandonment authorities
 
 
 [22]
 1982 Vt. Acts No. 187
 
 
 [23]
 See Lawson v. State, 730 P.2d 1308 (Wash. 1986) (in banc), holding similar state statute unconstitutional as applied to fee estate holders
 
 
 [24]
 The statute, purporting to be retroactive, was passed several years after the Preseaults had acquired the property interests involved, and several years before the Vermont Supreme Court decided their state-based claim. That court made no mention of the statute as relevant to its decision
 
 
 [25]
 See Preseault II, 494 U.S. at 22 (O'Connor, J., concurring) ("The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights.")
 
 
 [1]
 The Preseaults' complaint alleges a taking by the United States "by operation of the Rails-to-Trails provision of the National Trails System Act Amendments of 1983, 16 U.S.C. Section(s) 1247(d), Pub. L. 98-11." Consistent with that statute, the State, Vermont Railway, Inc., and the City of Burlington (City), with the approval of the Interstate Commerce Commission, entered into a lease in 1985 for the interim use of the railroad right-of-way by the City as a recreational walking and bicycle path. The contract runs for 5 years, renewable in 5 year periods, up to a maximum of 30 years. The contract specifically prohibits major alterations to the railroad grade, and contains a special termination clause allowing the State to terminate the lease, relay tracks and resume rail operations over all or part of leased premises, on six months notice. The contract also states that the property leased by the State to the City is subject to a number of utility and crossing agreements, which continue to run in the State's favor during the life of the contract. The City pays a token "rent" of one dollar every five years
 The alleged taking is said to arise from the role of the federal government in the conversion of the right-of-way. Although the State has adopted laws allowing for such conversion, see 1982 Vt. Acts No. 187 (requiring the state to retain interests in state-owned rights-of-way, upon cessation of active rail service, for future transportation uses and such other purposes not inconsistent therewith) and 1988 Vt. Acts No. 211 (specifically identifying the property at issue in this case as qualifying for such use), no claim is made in this case that the State is liable to the Preseaults for a taking of their property. Cf. Lawson v. State, 730 P.2d 1308, 1315-16 (Wash. 1986) (state statute authorizing change in public use of railroad right-of-way to a different public use without payment of compensation is unconstitutional under art. 1, Section(s) 16 of state constitution).
 
 
 [2]
 In Barney v. Burlington Northern Railroad Co., Inc., 490 N.W.2d 726 (S.D. 1992), cert. denied, 507 U.S. 914 (1993), the railroad donated its right-of-way to the state, which converted the right-of-way to a public recreational trail. The Supreme Court of South Dakota held that the interest of the landowners, who bought their land subject to the easement, was not "diminished by converting the right-of-way to a public recreational trail. The Landowners' reversionary rights will not mature until the right-of-way ceases to be used as a public highway." Id. at 733
 
 
 [3]
 The act which incorporated the RCRC gave it the "powers, rights, privileges and franchises incident to railroad companies and other corporations", 1898 Vt. Acts No. 160, Section(s) 1, and stated in section 9 that "[t]he corporation hereby created shall enjoy all powers, rights, privileges, and franchises, conferred upon or vested in railroad companies or corporations, and other corporations, by the general laws of this state. . . ." Id. Section(s) 9. The Vermont legislature was thus forward-looking in granting broad corporate powers to the railroad, instead of confining it only to operation of rail services
 By 1898, it was settled Law in Vermont that a state-charted railroad could acquire rights-of-way by eminent domain, see White River Turnpike Co. v. Vermont Central R.R. Co., 21 Vt. 590 (1849), and that a railroad could acquire a plank road company and convert an easement for a plank road into a rail track easement, without paying the grantor of the plank road easement additional compensation. See Brainard v. Missiquoi R.R. Co., 48 Vt. 107 (1874).
 
 
 [4]
 An easement can also be extinguished in Vermont by open, notorious, hostile and continued adverse possession by the owner of the servient tenement for the statutory period of 15 years. Scampini v. Rizzi, 172 A. 619, 621 (Vt. 1934). No claim of adverse possession by the Preseaults of the State's easements is made in this case. Nor would such a claim lie in Vermont, which by statute protects railroad rights-of-way against inadvertent loss from adverse use. See Vt. Stat. Ann. tit. 30, Section(s) 705 (1986)
 
 
 [5]
 There are no disputed facts. The parties were given full opportunity to submit findings of fact. After exchange of proposed findings of fact, the parties agreed that no facts remained to be found, and each side agreed that the other had stated its facts correctly. The parties submitted the uncontested facts for resolution by summary judgment. No issue is raised on appeal of the propriety of disposition of the case by summary judgment. The state law property issues were fully briefed and argued in this court. No party has suggested the need for any further fact submissions
 No facts were found by the Court of Federal Claims, and we need not defer under the clear error standard to the decision on whether the facts here add up to extinguishment of the easements. Even if Vermont's labeling of abandonment as a fact issue somehow demanded a measure of deference in review of the appealed decision, we would reverse that decision if this "court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). For the reasons set forth below, we would be required to reverse even on the deferential standard of review.
 
 
 [6]
 In other states, it seems that nonuse may be a factor that can lead to the conclusion of abandonment. See, e.g., Schnabel v. County of DuPage, 428 N.E.2d 671, 676-77 (Ill. App. 1981)
 
 
 [7]
 Until 1989, the law of Vermont on abandonment required, in addition to the affirmative conduct of the owner of the dominant tenement signaling unambiguous intent to abandon, that the owner of the servient tenement prove that he had relied to his detriment on the signal sent by the conduct of the dominant tenement owner. In Lague, the Supreme Court disavowed the reliance portion of its abandonment doctrine, while reemphasizing the heavy burden carried by one seeking to establish annihilation of an easement. Lague, 568 A.2d at 359
 
 
 [8]
 Reliance by the Court of Federal Claims on Proctor v. Central Vermont Public Serv. Corp., 77 A.2d 828 (Vt. 1951), and Timney v. Worden, 417 A.2d 923 (Vt. 1980), overruled on other grounds by Lague, Inc. v. Royea, 568 A.2d 357 (Vt. 1989), to show that removal of tracks spells abandonment, is also misplaced, because those cases do not consider the legal effect of removal of tracks on the question of abandonment of rail easements. Proctor, in short, did not adjudicate the question of abandonment of a rail right-of-way. Instead, the question was whether an electric utility easement granted by a railroad to run over its easement was extinguished by the admitted extinguishment of the rail easement. The electric easement was held to be within the scope of the original rail easement, and thus not abandoned by the extinguishment of the rail easement. Timney deals with the extinguishment of an easement by adverse possession. In that case, the owner of the servient tenement dug a cellar hole and then built, right over the alleged easement, a house on the cellar, which had stood for the requisite 15 year statutory period necessary to prove an easement by prescription in Vermont. The Supreme Court of Vermont held that the hostile, open and notorious adverse use for the requisite time extinguished the alleged easement
 
 
 [9]
 Compare the cursory treatment by the plurality judges of the facts in Stevens v. MacRae
 
 
 [10]
 I do not read Proctor v. Central Vt. Public Serv. Corp., 77 A.2d 828 (1951), to the contrary. In the first place, the abandonment of the rail line after 23 years of removed tracks and 25 years of nonuse for any rail purpose was not contested. Abandonment of the rail easement was not an issue in the case; whether the overlying electric easement survived the extinguishment of the rail easement was the only question before the court. At most, Proctor can be read to mean that removal of tracks is pertinent to the ultimate question of extinguishment of a rail easement. Proctor does not stand for the proposition that removal of tracks alone is always enough to prove abandonment
 
 
 [11]
 Preseaults' counsel, in the following colloquy with the court at oral argument on the summary judgment motion, agreed that the reasons for removal of the tracks could be relevant to the issue of abandonment
 THE COURT: What do you do about the situation where a railroad needs to pull up its tracks for emergency repairs?
 MR. HANIFIN: Well, if there is a plan to pull up the tracks and put new tracks down, sure that would not amount to an abandonment. I think that would be a reasonable exception, if you will, or a reasonable situation where, for instance, in the tracks -- for instance, they replace -- use this track to replace some other track. Presumably, at that other place for a while, there were no tracks while they ripped up the defective ones and put new down.
 
 
 [12]
 During the oral argument on the summary judgment on state law issues before the Court of Federal Claims, the placement of the trail next to the rails was described by the government's counsel:
 Little over a mile away, the railroad is still thriving; there is a track yard. And at that point, which is approximately one -- little over a mile, one mile and a third south of the parcels in question, there is rail still in, the train is going up and down and next to it is the trail. The existence of the trail and the operation of a railroad, contrary to Plaintiff's suggestion, is not inconsistent. They are, in fact, at the present time occurring.
 In fact, the State-City-Railroad contract creating the interim trail contemplates active rail service alongside the trail, and burdens the City with the responsibility to keep the track free of debris and obstructions.
 
 
 [13]
 I must disagree with the plurality judges' suggestion that the shifting public use doctrine may not exist at all in Vermont. The opinion of the Court of Federal Claims goes to some length to demonstrate the validity of the doctrine in Vermont law, as do the litigants, none of which suggest in any way that the doctrine can be avoided if the easements were not terminated in 1975. Indeed, the trial judge even expressed her view that had there been no abandonment in 1975, the easements "possibly" could have survived under their current uses
 
 
 [14]
 In addition, the plaintiff argued that even if rail use of the plank road easement were authorized under the terms of the original easement, the plaintiff was still harmed by a greater burden put on the servient tenement by the rail use. The Supreme Court rejected that contention
 
 
 [15]
 With respect to navigable waterways, which Vermont law considers capable for use for common passage as highways, see State v. Malmquist, 40 A.2d 534, 538 (Vt. 1944), Vermont embraces the public trust doctrine, which restricts private use of public waterways. While not directly relevant to the question of conversion of a railroad easement to a different public transportation use, the generous expression of the public trust doctrine by the Vermont Supreme Court provides an insight into the manner in which the court approaches issues of public use:
 The doctrine is not fixed or static, but one to be molded and extended to meet changing conditions and needs of the public it was created to benefit. The very purposes of the public trust have 'evolved in tandem with the changing public perception of the values and uses of waterways.'
 State v. Central Vermont Railway, Inc., 571 A.2d 1128, 1130 (Vt. 1989) (citations and internal quotation marks omitted), cert. denied, 495 U.S. 931 (1990).
 
 
 [16]
 One cannot argue that the easements in this case were granted solely for the express purpose of running railroad trains over them. In order for an easement to be limited to such express terms, the language of the easements must so specify and limit the uses
 Had the easements in this case been so expressly limited, then their use for any other purpose would extinguish them under Vermont law. Lague, 568 A.2d at 359. See Thompson on Real Property (Section(s) 60.04(a)(1)(iii) "Increasing the Frequency or changing the Type of Use of the Servient Tenement" ("If the grant states a specific purpose for the easement, courts are usually chary about expanding that use.")) (Thomas Ed.)
 When easements are not for express use purposes, and instead are for whatever proper purpose the owner wishes to put them to, the "general rule" cited by the plurality judges--permitting the scope of an easement to be adjusted in the face of changing times--applies. Since the original easements are not restricted just to running trains over them, the difference between the plurality judges and me is over the extent to which the easements can be put to new uses.
 
 
 [17]
 I assume that the plurality judges' attempt to claim a greater burden on the servient tenement from the trail is in hopes of connecting the argument to the hornbook law proposition that new uses of easements which create greater burdens require additional compensation to the servient tenement owner. That proposition, with which I do not quibble, needs no citation. It is however, wholly inapplicable to this case, first because the facts will not support allegations of greater burden, and second because the Preseaults have waived the point by not arguing it
 
 
 [18]
 The State recognizes the unpleasant burdens associated with use of the easements as a storage facility for rolling stock. To save the Preseaults from that particular nuisance, the contract creating the trail expressly provides that if the trail is removed in favor of future transportation uses, the easements will not be used as a storage facility
 
 
 [19]
 In the light of Stevens v. MacRae, discussed at length above, the Preseaults could not argue against use of the rail right-of-way for public transportation as a roadway
 
 
 [20]
 I do not know if the court would have reached the same conclusion if the railroad had been operated by the state, not for commercial gain, but for public benefit
 
 
 [21]
 In Lawson, plaintiffs takings case was dismissed on the pleadings for failure to state a claim upon which relief could be granted. Id. at 1310. The plaintiffs had alleged that the rail easement was "for rail purposes only," and the court interpreted "rail purposes" under Washington case law as limited to the "furnishing transportation, either freight or passenger, to the public." Id. at 1312. The court held that a hiking and biking trail could not be encompassed in that meaning of "rail purpose," and that under state law the scope of the original easement thus barred the new use. Such, of course, is not our case, for, as I have stated above, the easements in this case were not restricted to active rail transportation use
 
 
 [22]
 The Preseaults filed their complaint in this case in December 1990, at which time Lawson had been on the books for four years. Washington Wildlife had been on the books for seven years before the Preseaults came to the Court of Federal Claims. Lawson, as the plurality judges recognize, is virtually on all fours with the facts of this case (except that the plaintiff sued the state, not the United States): a state with a railbanking policy which used state government agencies to convert an old railroad easement to a recreational trail, pursuant to a state statute which authorized change of public use of a rail easement to the new public uses without payment of additional compensation to the owner of the servient tenement. In Lawson, the court noted that the existing federal rails to trails program was complimented by the state policies, and that the federal government had consented to the conversion of the easement to the trail. Because of the pervasive state action in perpetuating the easements, the court held the state laws to constitute a taking of the landowner's property under the state constitution
 If Lawson indeed is entitled to the weight assigned by the plurality judges, one could fairly query why the Preseaults instead did not bring suit against the State in the Vermont courts, on the theory that the State has committed the taking in this case.